*530
 
 Opinion
 

 KAUS, P. J.
 

 After a jury trial defendant was found guilty of a violation of section 11351, subdivision (a) of the Health and Safety Code—possession of heroin for the purpose of sale—as charged in the information. Three prior felony convictions, which defendant had admitted, were found to be true. Probation was denied. Defendant appeals.
 

 Issues
 

 The heroin which formed the basis of defendant’s conviction was discovered during the execution of search warrant 8378. Defendant’s first two points on appeal relate to the validity of the warrant and the search pursuant thereto.
 

 The heroin that had been found as a result of the search pursuant to the warrant had disappeared from the courtroom after the preliminary . hearing. This presents the only novel issue on this appeal.
 

 Defendant’s remaining points relate to routine issues arising during and after the jury trial.
 

 Facts
 

 The warrant in question was issued on April 27, 1977, and authorized the search of premises known as 1227½ West Washington Boulevard, a location further described as a “two-story building . . . tan brick in front.” The warrant also authorized a search of the person of defendant “David Charles Lovett, Jr., AKA Hippy Charles, . . .” and of all storage areas and containers “. . . inside and outside of the premises. . . .” It was issued on the basis of an affidavit by Officer David J. Harrison of the Los Angeles Police Department in which he briefly describes the premises at Washington Boulevard as previously noted. After setting forth his own expertise in the field of narcotics, Harrison stated that a confidential informant had told him that heroin was being sold and used at 1227½ West Washington Boulevard “by a male, Negro, named Hippy Charles.” With the cooperation of the informant a controlled buy of heroin from the premises described as 1227½ West Washington Boulevard was effected during the week of April 23, 1976. “Hippy Charles” was identified as the defendant when Harrison showed the informant a photograph of defendant and the informant “stated that the person in the
 
 *531
 
 photo is the same person he buys heroin from at 1227½ West Washington Boulevard, Los Angeles, that he knows as Hippy Charles.”
 

 The warrant was executed on April 28. A film canister containing six tightly wrapped balloons of heroin was found in a stand for potted plants outside of the back door of the premises which were a second-hand store.
 

 In addition the search disclosed a quantity of lactose, a triple beam balance of a type often used to weigh narcotics, a discolored mirror and credit card facsimile often used to mix heroin and a number of balloon fragments. Expert testimony put the “street value” of the heroin found at $150. A loaded shotgun was also found on the premises and defendant had $595 on his person.
 

 The defense was that the scale was part of defendant’s store inventory. Defendant had never seen the lactose, the balloons, the broken mirror or the credit card facsimile. The money on his person represented a month’s revenue from the sale of items from his store. Defendant did not sell or possess heroin. He had not placed the film canister in the plant stand. Two other individuals, a Miss Lockhart and a Mr. Robert Smith were on the premises at the time of the search.
 

 Additional facts will be stated in connection with our discussion of the issues.
 

 The Warrant and the Search
 

 As noted, the warrant called for a search of premises described as 1227½ West Washington Boulevard. In fact the premises searched were a store where defendant dealt in second-hand goods at 1227 West Washington Boulevard. The premises known as 1227½ had been carved out of the store known as 1227 in June 1976, about 10 months before the search. Until then, 1227½ was part of defendant’s shop. At the time of the trial 1227½ was a malt shop.
 
 [1]
 

 It is clear that the misdescription of the premises as “1227%” rather than “1227” afiected no substantial right of defendant. The magistrate obviously intended to authorize a search of the premises which were in fact searched, that is the premises occupied by defendant, which were inferentially the premises to which the confidential informant had
 
 *532
 
 referred and the premises from which the controlled buy had been made. Far more serious problems would have arisen had the police attempted to search the premises at 122714 about which nothing whatever had been said in the affidavit in support of the warrant. (Cf.,
 
 Tidwell
 
 v.
 
 Superior Court
 
 (1971) 17 Cal.App.3d 780, 787 [95 Cal.Rptr. 213].) If one thing is clear, it is that the magistrate intended to authorize a search of the premises occupied by “Hippy Charles” whether the street designation was 1227 or 1227½
 
 [2]
 

 Defendant also complains because the officers failed to comply with section 1531 of the Penal Code before executing the warrant.
 

 As noted, the premises searched were a second-hand store. The fact that they contained a bed where defendant may have slept from time to time does not change their character. When defendant was served with the warrant, he was in the front portion of the store. An officer “ran” into the building and started toward the back. Defendant asked him whether there was something he could do to help him with and the officer then gave him the warrant. The store was, of course, open to the public and according to defendant “anybody can come in [even] without my permission,. . .”
 

 Although the People cite no case to the effect that section 1531 of the Penal Code does not apply where the premises to be searched are a store open to the public, a contrary rule would make little sense. None of the purposes of the statute would be advanced by requiring police officers to state their “authority and purpose” before crossing the threshold of a store into which the general public has been invited to enter.
 

 The Loss of Heroin
 

 Defendant’s preliminary hearing was one of several scheduled for that particular day in Division 91 of the Los Angeles Municipal Court. Sometime before lunch the heroin and the $595 taken from defendant were received in evidence with clear statements from the prosecutor what the exhibits represented. The exhibits were put in a box. There were about a dozen people in the courtroom, some of whom may have been defendants, on bail, awaiting preliminary hearings of their own. Shortly thereafter the court took its lunch recess. The judge, the clerk, the deputy
 
 *533
 
 marshal and the court reporter all left the courtroom with the exhibits still sitting in the box in which they had been put. No one locked the doors. Some time during the afternoon the absence of the exhibits was noted. Neither the balloons nor the money was ever recovered.
 

 Although defendant, understandably, tries to make as much as possible of all this, it is not quite clear what he is driving at. The main thrust of his argument seems to be that the loss of the heroin deprived the conviction of any evidentiary basis. That claim has no merit whatever. The seizure of the heroin was testified to by Officer Flanders, who executed the search warrant. Flanders testified that he booked the balloons into evidence as DR 76-7500-521. Rollins, the police chemist, testified that he had received the evidence envelope marked DR 76-7500-521 and analyzed the contents. His opinion was that the six balloons did, in fact, contain heroin. Obviously, therefore, there was sufficient evidence to support the conviction even though the narcotic, itself, was not produced. (See e.g.,
 
 People
 
 v.
 
 Winston
 
 (1956) 46 Cal.2d 151, 155-157 [293 P.2d 40].)
 

 The real problem, as the Attorney General realizes, is
 
 People
 
 v.
 
 Hitch
 
 (1974) 12 Cal.3d 641 at pages 652-654 [117 Cal.Rptr. 9, 527 P.2d 361],
 

 Although the People somewhat half-heartedly suggest that
 
 Hitch
 
 sanctions are improper because they had carried the burden of showing that the court personnel in division 91 adhered “to rigorous and systematic procedures designed to preserve” the heroin, we find it difficult to accept that argument. The evidence showed that the courtroom did not even contain a receptacle in which to lock up exhibits after they were received in evidence. True, the deputy marshal testified that the courtroom personnel worked as a team, covering for each other, “making sure all the necessary jobs were done.” While we admire his esprit de corps, we cannot agree that a system which permits valuable exhibits to be available to members of the public, some of whom are under criminal charges, represents a “rigorous and systematic procedure” designed to prevent their loss.
 

 The real point is that
 
 Hitch
 
 simply does not apply.
 
 Hitch
 
 is a decision which attempts to adjust the balance between the two adversaries in criminal litigation: the investigative agency and the prosecution on the one hand, the defense on the other. It is the former which usually has possession and control of physical evidence which may be of assistance to the defense.
 
 Hitch
 
 prescribes certain rules for sanctions against the prosecution if it fails to meet its obligation to preserve the evidence for
 
 *534
 
 the defense. Here, of course, the adversary—the police, the prosecutor —had done all that they reasonably could: They had offered the evidence during the preliminary hearing and entrusted it to the court. It was the neutral arbiter, the court and its personnel, which fumbled the ball.
 
 Hitch
 
 does not apply.
 

 Unless we are to assume that a defense analysis of the balloons’ contents would have contradicted the proof adduced by Mr. Rollins, the police chemist—a totally unprecedented event as far as our experience is concerned—the loss of the contraband was not really to defendant’s disadvantage. The People’s proof was offered in somewhat awkward fashion, Rollins having to testify from memoiy reinforced by notes. He was quite effectively cross-examined to the effect that without his notes he really did not remember very much about this particular contraband.
 

 Prosecutorial Misconduct
 

 Defendant’s direct examination ended with his testifying that a Robert Smith was on the premises at the time of the execution of the search warrant. Cross-examination led off with questions whether defendant knew that Smith was a heroin user—no, he did not—and whether defendant was not selling heroin to Smith—no, he was not. These questions were asked and the answers given without objection. Then, however, followed about five pages of totally confused legal discussion which we shall try to summarize as best as we can. Defense counsel started out by moving to “strike counsel’s statement.” During a discussion at the bench it developed that the defense was then planning to call Smith as a witness and was unaware that he was perhaps subject to impeachment with a felony conviction. The prosecutor stated that “the officer” had personal knowledge as to Smith’s use of heroin and that he, the prosecutor, thought that Smith had a conviction for possession. The discussion then veered off into what would be proper questions to be asked of Smith if he were on the stand. The court asked “what is it you want me to do now?” A perplexing conversation ensued.
 
 [3]
 
 The prosecutor then announced that it was his intention to impeach defendant by showing that Smith was a heroin addict. The court, in effect, disagreed
 
 *535
 
 and then there followed several more pages of discussion on what to do with the questions that had been asked and the negative answers that had been given. Eventually the court ruled that it would instruct the jury along the line of CALJIC No. 1.02 and that was done.
 

 We see no reversible error. CALJIC No. 1.02 certainly put the entire matter in the proper light. It instructed the jury that it “must never speculate to be true any insinuation suggested by a question asked a witness.” The prosecutor’s good faith in asking whether Smith was a heroin addict was never challenged. Defendant had testified to Smith’s presence at the scene in order to suggest that Smith might have been the possessor of the heroin found in the planter. It was perfectly proper to ask whether in fact Smith was not a customer of defendant, there to purchase rather than to store heroin.
 

 There was no misconduct.
 

 Defendant’s final point is this: After the jury had returned its guilty verdict the prosecutor wanted his bail revoked. To that end he produced a clerk in the district attorney’s office who testified that the day before she had received an anonymous phone call to the effect that if defendant were convicted, he was going to leave the country. The court continued defendant on the same bail as before. If there was error in receiving the evidence, it obviously did no harm.
 

 The judgment is affirmed.
 

 Ashby, J., and Hastings, J., concurred.
 

 A petition for a rehearing was denied July 27, 1978, and appellant’s petition for a hearing by the Supreme Court was denied August 24, 1978.
 

 [1]
 

 During the trial defendant testified that at the time of the search, 1227½ was actually vacant.
 

 [2]
 

 It appears that the source of the error is the placement of the numbers on the outside of the two shops. Officer Harrison testified that he thought that defendant’s shop was 122716.
 

 [3]
 

 “MR. ALEXANDER: Your Honor, I want that stricken from the record, that question that he asked, that says, in effect—THE COURT: He was asking that question for the purpose of determining whether he was selling some heroin to that witness, because if the man is a user of heroin, it might tend to show that he was in there buying heroin. MR. ALEXANDER: Well, that question that the Court just said, I don’t argue that. Phrased properly, that might be a proper question. But what is improper—”