[Crim. No. 13111. Fourth Dist., Div. One. Jan. 20, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS MICHAEL REAGAN, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Paul Bell, Deputy State Public Defender, and Robert E. Slatten for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WEINER, J.**—Dennis Michael Reagan appeals from a judgment of conviction entered upon his plea of guilty to one count of robbery (Pen.

Code, § 211)[1] and admission he used a firearm in committing the offense (§ 12022.5) following the partial denial of his section 1538.5 motion. As we shall explain, we conclude the identification of Reagan by the victims and a witness is free from the taint of the illegally issued search warrant and affirm the judgment.

*Factual and Procedural Background*

In September 1980, Martin Chase placed an advertisement in a San Diego newspaper offering to sell his 1946 Harley Davidson motorcycle with sidecar. On several occasions Reagan went to Chase's home to look at the motorcycle and to discuss buying it. On September 30, Reagan returned while Mr. Chase was at work and asked Mrs. Chase if he could see the motorcycle once more. She went with him to the garage. When she turned away from him, Reagan placed a gun in her back, told her to be quiet, handcuffed, tied and gagged her and closed her in the tool room. He then broke the locking device on the motorcycle and drove away.

On October 10, 1980, police obtained a search warrant based on a telephonic affidavit made by Officer DeVowe. In the affidavit DeVowe swore his secretary told him she received a telephone call the day before "from a person who refused to identify himself." That person said: "He had information regarding an older motorcycle with a side car that was stolen in a San Diego robbery. There sh—there should be an ad in the L.A. Times to sell the motorcycle. The phone number would be a Clairemont number in San Diego. The motorcycle is supposed to be stored near 69th and Imperial in San Diego, possibly on Rex View in a pink house. The motorcycle should be in the possession of a Joe and that the theft is possibly a [sic] Hells Angels related. The informant then hung up."

DeVowe's sworn statement also included the following: After receiving the information from his secretary, he conducted an investigation during which he obtained a San Diego Police Department report describing the theft from Mrs. Chase of the antique 1946 Harley Davidson motorcycle with sidecar. He also obtained a copy of this advertisement appearing in the Los Angeles Times on October 9, 1980: "Harley Davidson 1940 style side car completely restored $1,500 by private party and a phone number of area code (714) 272-0073" and an

---

[1]All statutory references are to the Penal Code.

address in the Clairemont area. The billing address for the ad was Joseph Clinton, 323 Rex View, San Diego. Another officer told DeVowe he called the number listed in the ad. The man who answered said he was taking calls for another person. DeVowe personally visited the 300 block of Rex View Drive and saw a pink stucco house.

DeVowe and four other police officers executed the warrant on the same day it was issued. They found the Chases' motorcycle and sidecar and a tool chest belonging to Lim in the garage. While they were searching the garage, Reagan ran into the house through the front door yelling, "We've got a buyer." Police arrested Lim and Reagan.

Diehl, the victim of a motorcycle robbery which occurred several months before the Chase robbery, identified Reagan in a photographic lineup based on a photo taken after Reagan's arrest at the Rex View Drive house. Diehl could not identify Reagan in a live lineup or in the courtroom. Mr. and Mrs. Chase each identified Reagan in a live lineup and at the preliminary hearing.

Reagan was charged by information with robbery, burglary, grand theft, unlawfully taking and driving a motor vehicle, carrying a concealed weapon within a vehicle and receiving stolen property.

The superior court partially granted Reagan's 995 and 1538.5 motions, dismissing the weapon and receiving stolen property counts and suppressing physical evidence seized under the warrant. The court did not suppress the identification testimony of the victims and a witness, however, because it found that testimony free from the taint of the illegal search warrant. Under a plea bargain, Reagan pleaded guilty to the robbery charge and admitted his personal use of a firearm. The remaining charges were dismissed. This appeal followed.

*Discussion*

*Validity of the Search Warrant*

■ ■■ ■ The People say it is unnecessary for us to reach the merits of Reagan's appeal because the court erred in ruling the search warrant was legally insufficient.[2]

---

[2]Although not argued, we are satisfied the People may obtain review of an adverse ruling in a defendant's appeal.

Section 1252 provides: "On an appeal by a defendant, the appellate court shall, in

■ We are governed by the same standard as the trial court in reviewing a ruling on a motion to suppress evidence based upon a defendant's contention the evidence was seized under a search warrant issued without probable cause. The warrant is properly set aside only ""''if the affidavit fails *as a matter of law* to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause .... "'' (Italics in original. [Citations.])" *People v. Emanuel* (1978) 87 Cal.App.3d 205, 212 [151 Cal.Rptr. 44]; see also *People v. Superior Court (Corona)* (1981) 30 Cal.3d 193, 203 [178 Cal.Rptr. 334, 636 P.2d 23].)

■ Probable cause to issue a search warrant exists where the facts are sufficient to lead a person of ordinary caution to believe and conscientiously entertain a strong suspicion there is property subject to seizure in the location for which a warrant is sought. (*Caligari v. Superior Court* (1979) 98 Cal.App.3d 725, 729 [159 Cal.Rptr. 534].)

■ In this case, an unidentified informant volunteered information contained in the affidavit supporting issuance of the warrant. In *Aguilar v. Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], the United States Supreme Court established the standard for determining whether an affidavit based on hearsay is constitutionally valid. California courts have restated this standard as follows: "(1) the affidavit must allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the in-

addition to those issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General."

In interpreting that section, *People v. Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384] held the People could obtain review of the trial court's ruling suppressing defendant's first confession. Defendant had challenged denial of his motion to suppress a subsequent confession and various items of physical evidence he claimed were products of the confessions. The court stated if the People could not obtain review of the order suppressing the initial confession, the order would be binding even if clearly erroneous, a patently unreasonable result in light of the fact defendant based his challenge to the admissibility of the subsequent confession and other evidence on the validity of the ruling the first confession was inadmissible. (*Id.*, at p. 700.)

Reagan claims the court erred in failing to suppress identifications made by victims and a witness. He bases this claim on the assumption the court correctly ruled the search warrant was invalid. The court's reasoning in *Braeseke* is equally applicable here.

formant was credible or his information reliable." (*People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681].)

Here the court made the following findings in ruling on the motion to suppress: "The information supplied by the informant fails to show personal knowledge of the matters related. Although the police corroborated the information received, the affidavit to support the search warrant is legally insufficient in that it fails to satisfy the first prong test required by *Aguilar* v. *Texas*, 378 U.S. 108."

The Attorney General argues the trial court may have concluded the warrant was issued without probable cause because DeVowe, the affiant, received the information from his secretary who received it from the informant. The People cite two cases for the proposition an affidavit *containing hearsay on hearsay will support a search warrant if the information meets the* Aguilar *test.* In both cases, however, the affidavit clearly established the informant spoke with personal knowledge. In *People* v. *Superior Court* (*Bingham*) (1979) 91 Cal.App.3d 463 [154 Cal.Rptr. 157], the court concluded information supplied by four engineers to an insurance investigator who reported to the affiant was based on the engineers' personal knowledge. Similarly, in *Caligari* v. *Superior Court, supra,* 98 Cal.App.3d 725 [159 Cal.Rptr. 534], the court stressed the informant had first-hand knowledge of conversations he had *with another person involved in the sale of a controlled substance.* (*Id.,* at pp. 731-732.)

The affidavit before us does not establish the informant spoke with personal knowledge. The informant, who refused to identify himself, told DeVowe's secretary he "had information" about the motorcycle and sidecar. As DeVowe stated in his affidavit, the caller also said: "The motorcycle is supposed to be stored near 69th and Imperial in San Diego, possibly on Rex View Drive in a pink house. The motorcycle should be in the possession of a Joe and that the *theft is possibly a* [*sic*] Hells Angels related." Phrases such as "had information," "is supposed to be" and "possibly" do not connote personal knowledge on the part of the speaker. The stronger inference from such statements is the speaker was relating information he heard from others.

The Attorney General claims the information provided by the informant was sufficiently detailed to warrant the inference of personal knowledge. Our Supreme Court rejected this contention in *People* v. *Hamilton, supra,* 71 Cal.2d 176, where the description provided by the

informant was more detailed than in the case before us. There, the informant stated the premises to be searched contained "'approximately three hundred (300) rolls of dangerous drugs wrapped in tin foil in groups of ten pills per roll.'" (*Id.*, at p. 181.) We conclude, as did the trial court, the affidavit here fails to establish the informant spoke with personal knowledge of matters contained in his statement.

### The Court Correctly Denied the Motion to Suppress the Identifications

■ Reagan, contending the court erred in failing to suppress identifications of him made by the victims and another witness, asserts the illegally issued search warrant necessarily colors testimonial evidence identifying him. He argues his presence in court and at the lineup was the "direct product" of the illegal search because if police had not been present to execute the warrant they would not have heard him blurt out, "We've got a buyer."

Only where the Fourth Amendment violation in some manner produces the evidence to be suppressed does the Constitutional prohibition apply. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) Where an event occurs between the proscribed law enforcement conduct and the proffered evidence "which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained 'by exploitation of that illegality'" the taint from that evidence is removed. (*People v. Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)

Here, although the search warrant permitted police access to the residence, Reagan's voluntary and incriminating comments made in the exultation of commercial success were unrelated to that warrant. His volitional act of appearing upon the scene while the police were searching the house and garage was purely fortuitous. Under such circumstances his arrest and later identification by witnesses did not result from police exploitation of the unlawful search warrant.

In addition, before executing the illegal search warrant, the police lawfully obtained a considerable amount of evidence linking Reagan to the robbery. The victim provided a fairly detailed description of the robber. By verifying information given by an anonymous phone caller, police knew a Los Angeles Times advertisement billable to Joseph Clin-

ton at 323 Rex View offered a 1940 style Harley Davidson motorcyle and sidecar for sale. They also knew this type of motorcycle and sidecar were extremely rare. The caller had indicated the stolen motorcycle could possibly be found at a pink house on Rex View. Police observed the house at 323 Rex View was pink.

That police first saw Reagan from inside the house which they entered to execute the illegal warrant is not determinative. They could have observed him from numerous other locations near the house on which they had already focused their investigation. Police had every right to be on the front doorstep, the sidewalk or across the street, for example, and from any of these vantage points would have seen Reagan, who matched the description given by the victim, arrive at 323 Rex View and enter the house through the front door. All of these factors provide more than sufficient evidence independent of the search warrant to tie Reagan to the commission of the crime and support the trial court's conclusion the use of the illegally issued warrant did not taint the identification of defendant.

■ Although distinguishable on its facts, the analysis in *United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244] gives further support for this conclusion. There, even though the police conduct itself was unlawful as compared to the case before us where we deal with a magistrate's error, the court held the victim's in-court identification of the defendant was admissible.[3]

In *Crews*, the court explained a victim's in-court identification consists of three distinct elements: (1) the victim's presence at trial, (2) the victim's "knowledge of and ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime," and (3) defendant's presence in the courtroom. (*Id.*, 445 U.S. at p. 471 [63 L.Ed.2d at p. 546, 100 S.Ct. at p. 1250].) With respect to the first element, the court concluded the robbery victim's presence at trial was not the product of police misconduct, because she voluntarily reported the incident to the police. The police did not discover her identity as the result of the defendant's later unlawful arrest.

---

[3]The label of "unlawful police action" in the context of this case is overly broad. The police here lawfully endeavored to obtain a search warrant. A question raised but not addressed is whether a magistrate's blunder in issuing a search warrant should be treated differently than the situation where the constable alone fails to follow the Fourth Amendment's requirements.

Here, the facts lead to a similar conclusion. Mrs. Chase called the police immediately after the robbery. Officer DeVowe obtained the police department theft report describing the robbery and the suspect before he made the telephonic affidavit to obtain the search warrant. Police therefore did not discover the victim's identity as a result of the invalid search.

In analyzing the second element, *Crews* stated the victim constructed a mental image of her assailant at the time of the robbery which she later retrieved at trial, compared that image with the defendant and positively identified him. The trial court expressly found the victim based her in-court identification on an "independent recollection of the initial encounter with the assailant, uninfluenced by the pretrial identifications...." (*Id.*, 445 U.S. at p. 473 [63 L.Ed.2d at p. 547, 100 S.Ct. at p. 1251].) The Supreme Court determined this finding was amply supported by the record.

Here, although there are no express trial court findings on the issue of whether Mr. and Mrs. Chase's in-court identifications were based on independent recollections as opposed to the influence of the pretrial photographic and live lineups, there is substantial evidence to support implied findings to this effect. Mrs. Chase gave the following detailed description of the suspect to police at the time of the robbery: white male, about 21 years of age, 6 feet 5 inches tall, weighing 250 pounds, a biker type. Both Mr. and Mrs. Chase had ample opportunity to observe the suspect's appearance and form a mental image of him. The suspect came to their home before the September 30th robbery. During the first visit Reagan was with Mr. Chase for about 20 minutes. Mrs. Chase joined them during most of the visit. Several days later Reagan returned, staying at the Chase residence about a half hour. Mr. and Mrs. Chase were both present. Based on these facts, the recollections of Reagan by Mr. and Mrs. Chase were not influenced by the pretrial lineups.

The final element in *Crews* is defendant's presence in the courtroom. The concurring opinions indicate five members of the court concluded a defendant's face cannot be suppressed as the "fruit" of illegal police conduct. (*Id.*, 445 U.S. at p. 477 [63 L.Ed.2d at p. 550, 100 S.Ct. at p. 1253].)[4] This conclusion disposes of Reagan's claim the victim should

---

[4]Justice Brennan, author of the lead opinion, stated the court "need not decide whether respondent's person should be considered evidence, and therefore a possible 'fruit' of police misconduct," because before they illegally arrested Crews police knew

not have been allowed to view him at trial or anywhere else for the purpose of identification.[5]

Based on the factors discussed above, we conclude the court ruled correctly in partially denying Reagan's 1538.5 motion.

*Disposition*

Judgment affirmed.

Brown (Gerald), P. J., and Milkes, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 25, 1982.

---

his identity and had some basis to suspect he was involved in the charged crimes. (*Id.*, 445 U.S. at p. 477 [63 L.Ed.2d at p. 550, 100 S.Ct. at p. 1252].) Only two justices joined this part of the opinion.

[5]We are aware that the issue of the exclusion of a victim's identification of a defendant as a product of police illegality is currently before our State Supreme Court in *People* v. *Teresinski* (1980) 26 Cal.3d 457 [162 Cal.Rptr. 44, 605 P.2d 874], on remand from the U.S. Supreme Court to reconsider in light of *United States* v. *Crews, supra,* 445 U.S. 463. (See 449 U.S. 914 [66 L.Ed.2d 143, 101 S.Ct. 311].) Defendant in *Teresinski* has urged the court to reject the *Crews* holding in favor of a stricter standard based on independent state grounds. (See generally *People* v. *Brisendine* (1975) 13 Cal.3d 528 [119 Cal.Rptr. 315, 531 P.2d 1099].) Even were the court to decline to follow *Crews,* we doubt the result would affect our conclusion here since it is based on the existence of substantial evidence independent of any illegality tying Reagan to the crime of which he was convicted. (See pp. 99-100, *ante.*)

*Assigned by the Chairperson of the Judicial Council.