[No. A019840. First Dist., Div. Two. June 19, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILIP JOSEPH MAITA, Defendant and Appellant.

COUNSEL

Andrew H. Parnes, Thomas J. Nolan and Nolan & Parnes for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John B. Moy and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FLAHERTY, J.***—Philip Joseph Maita (hereafter appellant) was found guilty after a nonjury trial of six counts of pimping (Pen. Code, § 266h), seven counts of pandering (Pen. Code, § 266i) and one count each of keeping a house of ill fame and keeping a house used for prostitution (Pen. Code, §§ 315, 316). These convictions stem from appellant's management and ownership of the Lily Theater in Redwood City. The Lily Theater specialized in sexually explicit live entertainment. Appellant contends that his convictions cannot stand because (1) the on-stage performances at the Lily Theater were protected by the First Amendment, (2) the evidence was insufficient to support the pimping and pandering convictions, and (3) the evidence of appellant's management and operation of the Lily Theater was derived from unlawfully seized evidence.

On several occasions between February 3, 1981, and March 6, 1981, undercover officers of the San Mateo County Sheriff's office observed activities at the Lily Theater, which was owned and operated by appellant. The officers reported basically the same type of stage performance on each occasion.

After paying a $6 to $8 admission fee, with appellant sometimes acting as cashier, a customer enters the theater and sits on one of the seats surrounding the stage. Shortly thereafter, a female employee walks on stage,

*Assigned by the Chairperson of the Judicial Council.

accompanied by music, and promptly disrobes. She is naked except for garter belt, stockings, and high-heeled shoes. The employee first fondles herself and then steps up to the edge of the stage.

Several of the customers approach the stage and some of them place money on the floor of the stage. The employee then assumes a kneeling or squatting position and permits several of the patrons to suckle her breasts or orally copulate her. The employee then takes the money left onstage and puts it into her stockings. This activity usually lasts for approximately half an hour.

The second part of the show commences when the announcer, sometimes appellant, asks for a male volunteer from the audience. The female employee then takes the volunteer on stage, undresses him, and orally copulates him in full view of the audience. On at least one occasion, the employee had sexual intercourse with the customer during the second part of the act. The employee and customer go backstage together and another female employee appears onstage and repeats the performance.

In addition to observing these activities, the police also enlisted the services of a woman who agreed to work as an undercover informant. She was equipped with a miniature transmitting and recording device and met with appellant for the ostensible purpose of obtaining employment as a dancer at the Lily Theater. The interview was recorded. Appellant told the informant that employment at the theater would require nude dancing and real sex acts on stage with customers of the theater. Appellant told her that the sex acts would include orally copulating the customers and having the customer orally copulate her. Appellant stated that she could work four shows a day, seven days a week with each show being 40 minutes long. He further stated that he would pay her $12.50 for performing each live show. Moreover, she could expect to earn $25 to $30 in tips each show which she could keep.

Based on the information provided by the undercover informant and the observations of the undercover officers, a search warrant issued to search the Lily Theater and its corporate headquarters, Randolph Entertainment, Inc., for records pertaining to the operation of the theater. The corporate headquarters of the Lily Theater also served as appellant's residence. On March 6, 1981, police officers simultaneously served the warrants at the Lily Theater and at Randolph Entertainment, Inc. Evidence was seized from both locations showing appellant's management and operation of the theater.

The San Mateo District Attorney filed an information in superior court charging appellant with six counts of pimping, seven counts of pandering, three counts of presenting obscene live conduct and one count each of keep-

ing a house of ill fame and keeping a house used for prostitution. Appellant pled not guilty to all counts.

Appellant waived jury trial. After hearing several days of testimony, the court ruled that while appellant was not guilty of the obscenity charge, he was guilty of all the remaining counts. Appellant was placed on probation for five years on the condition that he serve six months in the county jail and pay a fine totalling $7,500. As a further condition of probation, appellant cannot be associated with any enterprise "which has sexual conduct or sexual activity as its primary theme." This appeal followed.

Appellant's primary contention is that the sexual activity at the Lily Theater took place in a legal context which was protected by the First Amendment of the United States Constitution. The trial court found appellant not guilty of the three counts of presenting obscene live conduct. Therefore, appellant argues, application of the pimping and pandering laws under which he was convicted to the nonobscene theatrical performance at the Lily Theater violates the First Amendment.

Theatrical performances have, in recent years, been afforded broad First Amendment protection. (See, e.g., *Morris* v. *Municipal Court* (1982) 32 Cal.3d 553 [186 Cal.Rptr. 494, 652 P.2d 51] [successful challenge to city ordinance prohibiting nude entertainment]; *Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483] [successful challenge to prohibition of "any obscene song, ballad or other words" as applied to theatrical performance]; *In re Giannini* (1968) 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535] [successful challenge to law regulating "wilful and lewd exposure" as applied to "topless" dancer]. No one seriously contends, however, that anything which occurs upon a stage is automatically immune from state regulation. In *California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390], the court pointed out with respect to First Amendment protections, ". . . [A]s the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases." (*Id.,* at p. 117 [34 L.Ed.2d at p. 351].) In other words, the courts have held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.

There is no doubt that in the instant case the application of the pimping and pandering laws creates an indirect tension with what the trial court found to be constitutionally protected expression. However, this infringement is justified if the government regulation ". . . is within the constitu-

tional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*United States* v. *O'Brien* (1968) 391 U.S. 367, 377 [20 L.Ed.2d 672, 680, 88 S.Ct. 1673].)

The People argue that the pimping and pandering laws under which appellant was convicted do not concern the control of speech at all. These rules, they argue, deal with conduct in which the government has a substantial interest and as such are not subject to the strict limitations of the decisions interpreting obscenity statutes.

Cases bear out the People's contention that the governmental interest in regulating pimping and pandering is "substantial" and "unrelated to the suppression of free expression . . . ." (*United States* v. *O'Brien, supra,* 391 U.S. at p. 377 [20 L.Ed.2d at p. 680].) ■ The pimping and pandering laws are aimed at discouraging prostitution by prohibiting third parties from expanding an existing prostitute's operation or expanding the supply of available prostitutes. (*People* v. *Jackson* (1980) 114 Cal.App.3d 207, 210 [170 Cal.Rptr. 476]; *People* v. *White* (1979) 89 Cal.App.3d 143, 151-152 [152 Cal.Rptr. 312]; *People* v. *Hashimoto* (1976) 54 Cal.App.3d 862, 867 [126 Cal.Rptr. 848].) ■ The government has a substantial interest in limiting prostitution and its related commercial endeavors of pimping and pandering. (*People* v. *Osuna* (1967) 251 Cal.App.2d 528, 532 [59 Cal.Rptr. 559].) It has been flatly held that "[t]he governmental interest in preventing [prostitution] is unrelated to speech or press." (*People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc.* (1977) 75 Cal.App.3d 523, 531 [142 Cal.Rptr. 338].)

Viewed in this light, we acknowledge that the state's unquestioned authority to prosecute under the pimping and pandering laws presents an incidental restriction on appellant's First Amendment freedoms. However, that restriction is no greater than is essential to further the substantial government interest in controlling prostitution. After all, the pimping and pandering laws do not prohibit the presentation of live, nude entertainment—they merely direct that the entertainer cannot have sexual relations with the audience.

We are satisfied, therefore, that the application of the statutes in question to the on-stage performances at the Lily Theater does not unconstitutionally infringe upon the freedom of speech or expression guaranteed by the First Amendment. We recognize that the court in *People* v. *Fixler* (1976) 56 Cal.App.3d 321 [128 Cal.Rptr. 363] reached the same result in its analysis

of a similar argument. In *Fixler,* a photographer hired a 14-year-old girl to engage in lewd acts and sexual intercourse with a male model with the intention of using the photographs in a nonobscene publication. The photographer argued that his activities were protected by the First Amendment, and that he could not be convicted of pandering without proof that the use of the photographs would violate the obscenity statutes. The court rejected this argument, stating "[t]he prosecution here was based on conduct and was not aimed at prohibiting any communication of ideas." (*Id.,* at p. 325.) *Fixler* unequivocally stands for the proposition that the First Amendment is not a shield against prosecution under the pimping and pandering laws. (See also *People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc., supra,* 75 Cal.App.3d 523.) For the foregoing reasons, we reject appellant's contention that he cannot be convicted of pimping and pandering without proof that the on-stage performances at the Lily Theater were obscene.

Penal Code section 266h defines a pimp as one who derives maintenance from the earnings of a prostitute. Section 266i punishes a person who, among other things, induces, persuades or encourages a female to become a prostitute. ▊ Appellant asserts that the activity at the Lily Theater was not prostitution and therefore, he cannot be guilty of the attendant crimes of pimping and pandering.

Penal Code sections 266h and 266i do not define the term "prostitution." The definition of "prostitution" is found in Penal Code section 647, subdivision (b). By statutory definition, "prostitution" includes "any lewd act between persons for money or other consideration."[1]

The California Supreme Court in *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238 [158 Cal.Rptr. 330, 599 P.2d 636], defined the term "lewd conduct" as used in another statute as meaning conduct which involves the touching of the genitals, buttocks, or the female breast for the purpose of sexual arousal or gratification. (*Id.,* at p. 256.) ▊ Hence, the definition of "prostitution" as used in Penal Code sections 266h and 266i has evolved to mean " 'sexual intercourse between persons for money or other consideration' and '*lewd*' acts, for money or other consideration, confined to conduct where the genitals, buttocks or female breasts of either the prostitute or the customer come in contact with some part of the body or the other for the purpose of sexual arousal or gratification of the customer or of the

---

[1]A prominent argument used throughout appellant's brief and advanced at trial is that the $6-$8 admission fee at the Lily Theater was consistent with the cost of other theatrical entertainment and significantly below the $20-$100 charge for prostitution in the area. By statutory definition, "prostitution" is the exchange of "money or other consideration" for a sexual act. The Legislature has not seen fit to place a minimum dollar value which denotes when "entertainment" becomes "prostitution" and neither do we.

prostitute." (*People* v. *Love* (1980) 111 Cal.App.3d Supp. 1, 16 [168 Cal.Rptr. 591]; *People* v. *Hill* (1980) 103 Cal.App.3d 525, 534-535 [163 Cal.Rptr. 99].)

■ It seems obvious to us that the testimony of the police officers who witnessed innumerable acts of oral copulation between paying customers and employees of the Lily Theater amply supports the trial court's finding that theater employees engaged in lewd acts in exchange for money. ■ Nothing in the language of Penal Code section 647, subdivision (b), defining "prostitution" excludes such conduct merely because it occurs during a theatrical performance before an audience. ■ Appellant's argument that there was no showing that the oral copulation was for the purpose of sexual arousal or gratification merits little discussion. It is difficult to conceive what other purpose that activity serves, and appellant does not enlighten us. ■ The conduct witnessed at the Lily Theater clearly falls within the definition of "prostitution" as that term is used in the pimping and pandering offenses.[2]

■ Appellant challenges his conviction under Penal Code section 266h. The pertinent portion of this section reads: "Any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of such person's prostitution . . . is guilty of pimping, a felony . . . ." Appellant claims that he did not have knowledge that the female employees, who were supplying the earnings of the Lily Theater, were engaged in acts that the law would consider "prostitution."

Although addressing a similar argument made with respect to the pandering statute (Pen. Code, § 266i), we find that the language of *People* v. *Montgomery* (1941) 47 Cal.App.2d 1 [117 P.2d 437], disapproved on an-

---

[2]Appellant presents a lengthy discussion of *People* v. *Fixler*, *supra*, 56 Cal.App.3d 321 and *People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc.*, *supra*, 75 Cal.App.3d 523 to support the argument that the definition of "prostitution" used in these cases is overbroad. *Fixler* and *Van de Kamp* both found that photographing paid models in various sexual activities constitutes prostitution. The definition of "prostitution" used in these cases which appellant finds so objectionable is ". . . that if A pays B to engage in sexual intercourse with C, then B is engaging in prostitution . . . ." (*People* v. *Fixler*, *supra*, 56 Cal.App.3d at p. 325.) The *Fixler* and *Van de Kamp* courts were presented with a factual situation where the money was provided by a nonparticipant in the sexual activity (the photographer). The definition of "prostitution" set out in these cases was designed to encompass sexual intercourse for hire by models who are receiving compensation from a third-party nonparticipant.

In the case before us, we are presented with a much more traditional fact pattern. Customers of the Lily Theater paid money to appellant to participate in sexual activities with the female employees. The money is being supplied by the person engaged in the sexual conduct. This court does not need to rely on the definition of "prostitution" as set out in *Fixler* and *Van de Kamp* to find that this activity constitutes prostitution.

other ground in *People* v. *Dillon* (1983) 34 Cal.3d 441, 454, footnote 2 [194 Cal.Rptr. 390, 668 P.2d 697]., adequately answers the instant argument: "[I]f a person places a female in a house of prostitution, knowing it to be such and intending the female to commit acts of prostitution therein, he is guilty of pandering, regardless of whether he did such act *with intent to violate the law,* or with malice, or feloniously, or otherwise." (*Id.,* at p. 16, italics added.) Appellant's desire to stay within the bounds of the law will not insulate him from conviction.

The record in this case demonstrates that not only did appellant have formal ownership of the Lily Theater, but he was actively involved in its day-to-day operations. He hired female employees, worked as the cashier, and acted as the announcer during some of the performances. It strains credulity to believe that appellant did not have full knowledge that customers of the theater pay an admission fee and participate in sex acts with the employees. The record here establishes an ongoing course of appellant deriving support from the proceeds of prostitution. Appellant's conviction under Penal Code section 266h cannot be assailed for lack of evidentiary support.

■ Appellant next claims that there was no evidence presented at trial that he procured theater employees for the purposes of prostitution. Therefore, he contends, his conviction under Penal Code section 266i cannot stand.

The offense proscribed by Penal Code section 266i is completed ". . . by a defendant's *act of procuring,* for a female, a place as an inmate in a house of prostitution." (*People* v. *White, supra,* 89 Cal.App.3d 143, 151, italics in original.) In *People* v. *Hashimoto, supra,* 54 Cal.App.3d 862, a policewoman posed as a prostitute. The defendant, a travel agent, offered to refer foreign tourists to her on a regular basis. In response to a contention that the evidence was insufficient to support defendant's conviction for pandering, the court stated: "The defendant offered to provide a ready-made clientele with fixed prices and a reasonable assurance of a continuous volume of business should [the policewoman] agree to the plan. This constituted active encouragement within the purview of section 266i of the Penal Code, and neither success nor consummation of the proposal was a necessary element of a violation of the pandering statute. (*Id.,* at p. 866.)

Clearly, the conduct described in *Hashimoto* is applicable to appellant's conduct herein. The appellant ran four shows a day, seven days a week. There were usually 40 customers in attendance. Appellant paid his female employees $12.50 for performing each live show involving the sex acts. They were also allowed to keep the $25 to $30 earned in tips each show.

Appellant clearly provided "a ready-made clientele with fixed prices and a reasonable assurance of a continuous volume of business . . . ." (*Id.,* at p. 866.) His conviction for pandering under Penal Code section 266i was proper.

■ Appellant claims that evidence of his ownership and management of the Lily Theater was seized from the theater premises and the corporate offices of Randolph Entertainment, Inc., under a search warrant issued without probable cause. Hence, all business records seized pursuant to the warrant must be suppressed.

■ Probable cause to issue a search warrant exists where the facts stated in the affidavit "make it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." (*People* v. *Cook* (1978) 22 Cal.3d 67, 84, fn. 6 [148 Cal.Rptr. 605, 583 P.2d 130].) ■ The warrant is properly set aside only " ' " "if the affidavit fails *as a matter of law* to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit . . . ." ' " (Italics in original.) (*People* v. *Emanuel* (1978) 87 Cal.App.3d 205, 212 [151 Cal.Rptr. 44], citing *People* v. *Benjamin* (1969) 71 Cal.2d 296, 302 [78 Cal.Rptr. 510, 455 P.2d 438]; *People* v. *Reagan* (1982) 128 Cal.App.3d 92, 97 [180 Cal.Rptr. 85]; see also *People* v. *Superior Court (Corona)* (1981) 30 Cal.3d 193, 203 [178 Cal.Rptr. 334, 636 P.2d 23].)

■ In this case, the information supplied in the 10-page affidavit for search warrant was based on the personal observations of the affiant, Sergeant Alan Johnson, and other members of the San Mateo County Sheriff's office during performances at the Lily Theater. The affidavit also contained a summary of the confidential informant's recorded interview with appellant. Taken as a whole, the affidavit was replete with information showing that the crimes of pimping and pandering were being committed at the Lily Theater.

The combination of all the facts contained in the affidavit would lead any reasonable magistrate to believe that it was substantially probable that the items associated with the running of the Lily Theater and its attendant acts of pimping and pandering would be stored or secreted at either the theater itself or its corporate headquarters. We conclude, as did the court below, that the affidavit was legally sufficient to support a finding of probable cause to search both premises.

Appellant seeks to suppress evidence seized from the corporate office of Randolph Entertainment, Inc., because the warrant was improperly execut-

ed. Specifically, appellant argues that (1) there was insufficient evidence to establish that the warrant was executed prior to 10 p.m. and (2) that the officers failed to comply with the knock and notice requirements prior to entry.

Penal Code section 1533 provides that in the absence of a specific direction by the magistrate, "the [search] warrant shall be served only between the hours of 7 o'clock a.m. and 10 o'clock p.m." Appellant argues that all evidence seized at the corporate office must be suppressed because the search warrant was not executed before 10 p.m.

Sergeant Alan Johnson was in charge of the investigation of the Lily Theater. He testified that on March 6, 1981, plans were made to simultaneously execute the search warrants issued for the Lily Theater and the corporate offices of Randolph Entertainment, Inc., which also served as appellant's residence. He recalled that it was some time between 9:50 and 9:55 p.m. that he made radio communication with the officers to serve the warrant at appellant's home.

Deputy William Cogswell was one of the officers who executed the warrant at appellant's home. He testified that seven officers in two patrol cars arrived at appellant's residence at 9:52 p.m. They exited their patrol cars, but were detained at the front gate by several barking dogs who would not allow them onto the premises. Tabitha Maita, appellant's wife, met the officers in her yard where they identified themselves and presented her with the search warrant. Deputy Cogswell stated that the officers entered appellant's residence prior to 10 p.m.

Appellant challenges the reliability of Deputy Cogswell's testimony by reciting the testimony of Tabitha Maita. Mrs. Maita testified that it was shortly after 10 p.m. when she met the officers at the front gate. She remembered the time because her children were watching a special two-hour episode of the "Dukes of Hazzard" and the second part had already begun.

The trial court denied appellant's motion to suppress the evidence seized from his residence stating "I am not able to pinpoint from the testimony the minute that they crossed the threshold of the house, but [Mrs. Maita] was clearly aware of their presence in my view before 10:00 o'clock." The court in *People* v. *Zepeda* (1980) 102 Cal.App.3d 1 [162 Cal.Rptr. 143], held that a search warrant is not invalidly executed pursuant to Penal Code section 1533 when its execution is part of one continuous transaction which begins before 10 p.m. and continues after that hour. (*Id.*, at p. 8.) Mrs. Maita testified that she became aware of flashing lights, the barking dogs and men by the gate "a good fifteen minutes" before she exited the resi-

dence. She placed the time that she met the officers at the gate at "shortly after 10:00." She was then presented a copy of the warrant by the police officers which she proceeded to read. While she was putting the dogs in the garage, the officers entered the residence. Even the evidence most favorable to appellant shows that Mrs. Maita was aware of the officers' presence and their intention to gain entry to the house well before 10 p.m.

The privacy interest guarded by section 1533 of the Penal Code is to limit " 'the peculiar abrasiveness of official intrusions [after 10 p.m.].' " (*Tidwell* v. *Superior Court* (1971) 17 Cal.App.3d 780, 786-787 [95 Cal.Rptr. 213].) The intrusion into appellant's privacy began well before 10 p.m. Under these circumstances, Penal Code section 1533 was not violated.

██ Appellant argues that the officers did not comply with the knock and notice requirements of Penal Code section 1531 prior to entry into the residence.[3] Specifically, he asserts that the officers failed to state their purpose before entering the front gate and that they failed to knock on the door of the residence prior to entry.

Contrary to appellant's contention, the record clearly demonstrates that the officers explained their purpose for demanding admittance to appellant's residence prior to entry. Mrs. Maita remembered this colloquy between herself and one of the officers at the front gate: ". . . [S]o, I said, 'What do you want?' and he says, 'I am going to search your house' . . . 'I am from the San Mateo County Sheriff's Department.' . . . [¶] So then he shows me a Warrant and so I take the time to read the address and the name . . . ." There is substantial evidence that the officers executed the search warrant after announcing their "authority and purpose" in compliance with Penal Code section 1531.

The testimony was uncontroverted that while Mrs. Maita and her children were putting the dogs in the garage, the officers entered the residence without knocking. Appellant argues that the provisions of section 1531 mandated that the police knock on the door of the residence prior to entry.

We find this case factually indistinguishable from *People* v. *LaJocies* (1981) 119 Cal.App.3d 947 [174 Cal.Rptr. 100]. In *LaJocies,* the officers

---

[3]Section 1531 reads as follows: "The officer may break open any outer or inner door or window of a house, or any part of a house or anything therein, to execute the [search] warrant, if, after notice of his authority and purpose, he is refused admittance."

went to a residence to conduct a "parole search." After showing identification and announcing their purpose, they asked one of the residents to put the dogs in the back yard. While she was doing so, the officers opened the screen door and began to search the house. The court reasoned that "the underlying policies of section 1531 were not frustrated by the officer's conduct in the present case. The policy considerations behind the statute are protection of the individual's right to residential privacy, and the avoidance of situations conducive to the risk of violence to occupants or police officers which would often attend entry by an unknown intruder. [Citations.] Here, neither appellant's privacy nor a violent confrontation was threatened by the officers' failure to delay their entry into the residence." (*Id.*, at p. 953.)

The court concluded that there was substantial compliance with section 1531 and that the underlying provisions and policies of the statute were served by the conduct of the officers. The reasoning of the court in *LaJocies* is applicable to the instant factual situation. We thus reject appellant's contention that section 1531 was infringed by the manner in which the officers entered appellant's residence.

Appellant next argues that the police did not comply with the knock and notice requirements set out by Penal Code sections 1531 and 844 when they entered the Lily Theater on February 3 and March 6, 1981.[4]

Appellant's argument is short-circuited by the fact that the Lily Theater was open to the general public. None of the purposes of section 1531 and section 844 with their concern for intrusions into residential privacy would be served by requiring police officers to state their "authority and purpose" before crossing the threshold of a theater into which the general public has been invited. (*People* v. *Lovett* (1978) 82 Cal.App.3d 527 [147 Cal.Rptr. 136] [§ 1531]; *People* v. *James* (1971) 17 Cal.App.3d 463, 466-467 [95 Cal.Rptr. 121] [§ 844].) The Lily Theater did not constitute a "house" as contemplated by section 1531 and section 844 nor was it entitled to the protection designed to secure a person in his home.

---

[4]On February 3, 1981, several undercover officers paid the $6 admission and observed the performance at the Lily Theater. The officers then arrested the employees and patrons engaged in acts of prostitution. It is uncontroverted that the officers did not have a warrant. Penal Code section 844 requires that prior to a warrantless entry of a "house," a police officer must demand admittance and explain the purpose for which the admittance is sought. Even though Penal Code sections 1531 and 844 are worded slightly differently, the courts have interpreted them to encompass the same basic rules. (*People* v. *Schad* (1971) 21 Cal.App.3d 201, 207 [98 Cal.Rptr. 439].)

The judgment is affirmed.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied July 19, 1984, and appellant's petition for a hearing by the Supreme Court was denied August 15, 1984.