Filed 7/19/13  P. v. Purnell CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062088 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD238470) |
| SCORPIO DEMAR PURNELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura H. Parsky, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

Scorpio Demar Purnell appeals the judgment sentencing him to prison for five years four months after a jury found him guilty of two counts of pimping. Purnell contends the trial court prejudicially erred by admitting three hearsay statements at trial. We affirm.

FACTUAL BACKGROUND

Luke Johnson, a detective with the San Diego Police Department, conducted an undercover investigation involving a suspected prostitute named Marissa Williams. As part of that investigation, Johnson visited various Internet sites on which prostitutes advertise and located an advertisement for Williams. Johnson then contacted Williams to set up a "date" for an "in-call," i.e., a meeting at a motel to have sex. Williams informed Johnson she charged $220 per hour and directed him to meet her at a certain motel that has a reputation for prostitution.

Johnson went to the motel with other undercover police officers. While the other officers stayed outside, Johnson went to Williams's room and knocked on the door. Williams opened the door, and Johnson entered the room. Another woman, later identified as Brittni Silva, was also in the room. When Silva went into the bathroom, Johnson and Williams discussed their "date." Williams agreed to perform fellatio for $220. Johnson gave Williams the money and asked her to use a condom. Williams went to retrieve a condom and then returned wearing only a brassiere and panties. At that point, Johnson signaled the other officers who had accompanied him to enter the room and arrest Williams.

The other officers entered the motel room and escorted Johnson out. While Johnson went to his car and waited in the parking lot for information from the other officers, they detained Williams and Silva in the room and conducted a search. One of the officers found men's clothing hanging near the bathroom and a laptop computer resting on one of the beds. The computer contained photographs of Williams and Silva that were used in Internet advertisements, as well as a photograph of Purnell holding a stack of cash with a distinctive white band through the middle. The Internet search history of the computer indicated a user recently had searched for parts for a Dodge Charger and for information about "burning during intercourse." Based on his discovery of men's clothing in the motel room and his training and experience that most prostitutes work for pimps, the officer asked Williams if there was a man in the parking lot waiting for her, and she said there was. The officer then contacted Johnson to let him know there was probably a pimp in a Dodge Charger in the parking lot.

Johnson located a Dodge Charger in the motel parking lot. Purnell was in the driver seat, and another man was in the front passenger seat. Johnson removed the men from the vehicle and conducted a search. Johnson found a laptop computer on which Purnell's passenger was conducting an Internet search for Dodge Charger parts. In the glove box, Johnson found $9,000 in stacked bills, which Williams later told him was her and Silva's "earnings." The profile of the stack of cash had the same distinctive white band as that held by Purnell in the photograph of him stored on the computer found in the motel room. Insurance papers and other documents found inside the vehicle indicated

3

Purnell was the owner. In the trunk, Johnson found women's clothing, as well as papers and a container bearing Williams's name.

Johnson also searched Purnell's person. He found $130 in one of Purnell's pants pockets and more money in his wallet. Johnson confiscated a mobile telephone Purnell was holding. The telephone had a Facebook account with Purnell's picture on it. Purnell's telephone also contained listings for telephone numbers that matched the numbers posted in Williams's and Silva's Internet advertisements; when Johnson called those numbers, mobile telephones inside Williams's motel room rang.

Johnson later downloaded and analyzed the contents of Purnell's telephone, including 3,000 text messages. Several messages, many containing jargon commonly used by pimps and prostitutes, indicated that Williams and Silva were performing sex acts in exchange for money and that Purnell was in control of the money. For example, in one conversation between Williams and Purnell, Williams complained of mistreatment: "How do I deserve this when I [have] been the only one getting dates[?] [¶] [T]hat guy is coming tomorrow so that's 400 dollars." Purnell responded that Williams was being disrespectful by not earning more money: "$400[?] [B]itch[,] keep it[,] if that's going help [yo]u represent me better[.] [Y]ou'll never understand[.] [I]t[']s good." The next day, Williams asked Purnell, "Can I get a few dollars[?]" On another occasion, Williams wrote that she was "loyal" to Purnell and "would never lie to [him] when it comes to money." She also asked Purnell to drop her off at a motel for a "date," and he agreed to do so. In another series of text messages, Williams reported she had received three requests for "bb" services (i.e., bareback sex acts, which are those

4

performed without a condom) through her Internet advertisements. Purnell then asked whether Silva had also posted an advertisement on the Internet, and directed Williams to tell Silva how to do "car dates" (i.e., solicitations of motorists as they drive along the street): "[M]oney first[.] Make [them] touch [yo]u first before they say anything[.] [Yo]u know the get down." The following day, Williams sent Purnell a text message that "Brit got a date ☺ 130." That "date" apparently did not go well, for later that day Silva sent Purnell a message that she needed to see a physician as soon as possible because "[e]ver since that night [they] had sex [her] private hasn't been the same. [It's] burning, [and] in my date I sta[r]ted crying[.] [T]hat's how bad it hurts, even dur[i]ng sex."

Williams and Silva also had "dates" with Adam Brooks. Brooks saw Williams's advertisement on the Internet and contacted her. On one "date," Williams brought Silva with her; Brooks had sex with both women, and paid them $800 or $900. On another "date," Brooks paid Williams $500 or $600 for sex. After Williams was arrested in the undercover operation, she contacted Brooks and told him "she needed some money to live" because "something happened to her." When Brooks asked Williams what she needed, she sent him a text message with Purnell's name and bank account number, and told him to deposit money into that account.

PROCEDURAL BACKGROUND

The People charged Purnell with two counts of pimping, one for Williams and the other for Silva. (Pen. Code, § 266h, subd. (a).) A jury found Purnell guilty on both counts. The court sentenced him to prison for the middle term of four years for one

5

conviction, plus a consecutive term of one year four months for the other. (*Id.*, §§ 266h, subd. (a), 1170.1, subd. (a).)

DISCUSSION

Purnell challenges the admissibility of three statements the People introduced at trial: (1) Johnson's statement that Williams told him the $9,000 found in Purnell's car was from her and Silva's "earnings"; (2) the text message from Williams to Purnell that "Brit got a date ☺ 130"; and (3) Brooks's statement that Williams telephoned him and asked him to deposit money into Purnell's bank account. Purnell renews on appeal the same hearsay objections he raised in the trial court. (Evid. Code, § 1200.) He further argues the admission of these statements was "extremely prejudicial because, together, they provided the only direct evidence that [he] was supported, in whole or in part, by the women's prostitution earnings, a necessary element of the two charges." The People counter that the challenged statements were not hearsay, but were "admissible as 'verbal acts' or 'operative facts' of the charged crimes." Alternatively, the People argue that even if the statements were hearsay, they were admissible under the exception to the hearsay rule for statements of a coconspirator. (*Id.*, § 1223.) Lastly, the People contend any error in admitting the three challenged statements was harmless. We agree with the People that any error in admitting the statements of which Purnell complains was harmless, and we therefore need not, and do not, consider the parties' competing contentions regarding the admissibility of the challenged statements.

Where, as here, a party challenges a judgment on the ground that evidence was erroneously admitted over an objection based on the rules of evidence, an appellate court

6

may reverse the judgment only if the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 to determine whether the erroneous admission of hearsay resulted in a miscarriage of justice that requires reversal. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619; *People v. Leach* (1975) 15 Cal.3d 419, 445; *People v. Garcia* (2008) 168 Cal.App.4th 261, 292.) Under that standard, such error is reversible "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) We therefore must examine the record to determine whether it is reasonably probable the jury might not have found Purnell guilty of pimping had the trial court excluded the three statements he contends were inadmissible hearsay.

We begin by setting out what the People had to prove for the jury to find Purnell guilty of pimping. A defendant commits the offense of pimping when he "know[s] another person is a prostitute" and "lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution." (Pen. Code, § 266h, subd. (a); see *People v. Grant* (2011) 195 Cal.App.4th 107, 115; *People v. McNulty* (1988) 202 Cal.App.3d 624, 630.) A "prostitute" includes a person who engages in sexual intercourse or other lewd acts with another person in exchange for money. (Pen. Code, § 647, subd. (b); *People v. Maita* (1984) 157 Cal.App.3d 309, 317-318.) Thus, to establish the offenses charged in this case, the People had to prove that Purnell knew

7

Williams and Silva engaged in sexual intercourse or other lewd acts for money, and that he derived support from their earnings for engaging in such acts.

Although Purnell does not dispute that he knew Williams and Silva performed sex acts for money, he contends that if the statements he challenges on appeal had been excluded at trial, there would have been no direct evidence that he derived support from their performance of such acts. We disagree. In a highly incriminating series of text messages found on Purnell's telephone, Williams reported she had an upcoming "date" in which she would earn $400, and Purnell, using jargon common among pimps and prostitutes, complained she was being disrespectful by not earning enough money for him. Other text messages found on Purnell's telephone also established that he directed Williams and Silva to perform sex acts for money, transported them to certain "dates," and had control over the money they earned on "dates."

Moreover, the facts revealed in the undercover police investigation, when considered together, strongly suggested that Purnell derived support from Williams's and Silva's prostitution. Specifically, (1) Purnell was waiting in his car outside a motel known for prostitution, while Williams and Silva were inside the motel and Williams agreed to perform fellatio on Johnson for $220; (2) Purnell stored Williams's and Silva's telephone numbers in his mobile telephone; (3) Purnell had $9,000 in cash inside his car; (4) a photograph of Purnell holding what appeared to be the same stack of cash was stored in the computer found in the motel room, which also contained photographs that Williams and Silva used in their Internet prostitution advertisements; (5) men's clothing was found in the motel room; and (6) women's clothing, as well as papers and a container

8

with Williams's name on them, were found in the trunk of Purnell's car. Although this evidence is circumstantial, not direct, "[c]ircumstantial evidence is as sufficient to convict as direct evidence." (*People v. Reed* (1952) 38 Cal.2d 423, 431; accord, *People v. Bloyd* (1987) 43 Cal.3d 333, 347; *People v. Park* (2003) 112 Cal.App.4th 61, 68.)

In sum, even without the three statements that Purnell argues the trial court should have excluded as hearsay, there was ample evidence to establish that Purnell derived support from the money Williams and Silva earned as prostitutes. That evidence was not contradicted at trial, is not challenged on appeal, and points convincingly to Purnell's guilt. Having reviewed the record, we are of the opinion that there is no reasonable probability the jury would not have returned guilty verdicts had the trial court excluded the statements Purnell challenges on appeal. Any error in the admission of those statements therefore did not result in a miscarriage of justice requiring reversal of the judgment. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); *Watson*, *supra*, 46 Cal.2d at p. 836.)

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.

10