89 Cal.Rptr.2d 245 (1999)
75 Cal.App.4th 347
The PEOPLE, Plaintiff and Respondent,
v.
Karen Kay JANINI et al., Defendants and Appellants.
The People, Plaintiff and Respondent,
v.
Amphone Ann Ly et al., Defendants and Appellants.
No. G024959.
Court of Appeal, Fourth District, Division Three.
September 30, 1999.
Review Denied January 25, 2000.[*]
*246 Roger Jon Diamond, Santa Monica, for Defendants and Appellants.
Jack L. White, City Attorney, Patrick Ahle, Senior Assistant City Attorney, Rutan & Tucker and Jeffrey A. Goldfarb, Costa Mesa, for Plaintiff and Respondent.

OPINION
CROSBY, J.
Here we review misdemeanor convictions of seven "lap dancers" and two "theater managers," as aiders and abettors, for alleged local ordinance violations and prostitution *247 per section 647, subdivision (b) of the Penal Code. All must be reversed.
In Tily B., Inc. v. City of Newport Beach (1998) 69 Cal.App.4th 1, 81 Cal. Rptr.2d 6, we upheld the power of municipalities to revoke the licenses of adult businesses that bumped up against local ordinances prohibiting erotic touching. We accepted Newport Beach's assertion that its ordinance was a non-criminal, local business regulation. In this case, though, the City of Anaheim, in its own zeal to discourage disfavored entertainment forms,[1] has crossed the line between regulation and criminalization. The Anaheim City Council may regulate establishments offering lap dancing, but its power to wield a criminal sanction for erotic entertainment violations of a "sex-oriented business permit" is preempted.
Use of the Penal Code against dance performers is a sensitive proposition as well, but for a different reason: Theatrical dancing is a well-recognized art form protected by the First Amendment. Unfortunately, the trial judge's bare bones CALJIC instruction concerning the prostitution counts was inadequate to convey this important context to the jurors.

I
The defendants are female performers who worked as lap dancers at the Sahara Theater, an adult entertainment business aptly located in a strip mall, and so-called theater managers accused of aiding and abetting them. The women generally danced nude on a stage and then, dressed in bikinis, performed individual dances for patrons, being paid $10 per dance, plus tips.
On two days in May and September 1997, several undercover vice officers used hidden cameras to videotape the performers brushing their scantily-clad breasts, buttocks, and genitals up against the clothed bodies of their male patrons. The women were arrested for violating a no-touching rule in the Anaheim Municipal Code.[2] Prostitution charges were added by the prosecutor (Pen.Code, § 647, subd. (b)).
There were separate trials for the May and September incidents, the Janini and Ly cases, respectively. The alleged acts of "prostitution" occurred this way: The patrons, who were wearing street clothes, sat passively while the dancers used their scantily clad breasts, buttocks, and vaginal areas to "touch" various clothed parts of the spectators' bodies, including their torsos, laps, and legs.[3]
The city attorney repeatedly argued in the various trials that the prostitution laws *248 were "very broad" and did not require sexual intercourse or even any skin-to-skin contact. As he urged in rebuttal at the Janini trial, "There was some discussion about whether it was clothed or unclothed.... You have to understand when you read this section, it's very broad.... [D]oes it say that the touching has to be skin to skin?.... That's not an element I have to prove.... There just has to be touching." (Italics added.) He equated prostitution with "disorderly conduct," telling the jurors to "[p]ut the labels out of your mind because labels don't mean anything. Conduct is what you are concerned about.... All you decide is if they did a certain thing on a certain day, that's all you're going to do."
Not surprisingly, both cases resulted in convictions for violation of the no-touching ordinance. Four of the female performers in the Janini case were also convicted of prostitution, and the two male theater managers were convicted on an aiding and abetting theory. The Ly case resulted in a hung jury on the prostitution count against the performers, and a male manager was acquitted of aiding and abetting. The women, however, were convicted of prostitution on retrial.
The appellate division of the superior court consolidated the cases and affirmed the convictions, but on its own motion certified that transfer appeared necessary to settle important questions of law regarding the interplay between lap dancing, state preemption, and prostitution (Cal. Rules of Court, rule 63(a)). We accepted transfer (Cal. Rules of Court, rule 62(a)).

II
In reviewing the preemption issue arising from the prosecution of the municipal code violations, we are primarily guided by the Supreme Court's decisions in Lancaster v. Municipal Court (1972) 6 Cal.3d 805, 100 Cal.Rptr. 609, 494 P.2d 681 and Cohen v. Board of Supervisors (1985) 40 Cal.3d 277, 219 Cal.Rptr. 467, 707 P.2d 840. Subject to constitutional constraints, the rule is that local governments may impose reasonable time, place, and manner restrictions on the operation of adult businesses; but they cannot use the criminal law to prohibit sexual conduct as part of their regulatory activities.
In Lancaster the court affirmed the dismissal of a misdemeanor prosecution against a woman who was charged with violating an ordinance against massaging a person of the opposite sex for hire. Without direct statutory authorization, the county's regulation of sexual conduct "must be held invalid because the state has preempted the criminal aspects of sexual activity." (Lancaster v. Municipal Court, supra, 6 Cal.3d. at p. 810, 100 Cal.Rptr. 609, 494 P.2d 681.) Lancaster construed Penal Code sections 318.5 and 318.6 as only providing very narrow exceptions to the long-established rule against local use of the criminal law in sexual matters. (Id. at p. 808, 100 Cal.Rptr. 609, 494 P.2d 681.)
Lancaster was followed in Cohen v. Board of Supervisors, supra, 40 Cal.3d 277, 219 Cal.Rptr. 467, 707 P.2d 840, where the Supreme Court allowed municipalities to regulate escort services by requiring police permits and annual license fees. The court distinguished between criminal statutes (which were preempted) and licensing ordinances (which were not): "Unlike the ordinance in Lancaster, which made bodily contact between members of the opposite sex criminal, the present ordinance does not proscribe conduct between individuals. Rather, it only requires a permit by escort service operators and escorts and the disclosure of information by customers." (Id. at p. 297, 219 Cal.Rptr. 467, 707 P.2d 840.)
Here, then, are the rules: Cities may require adult theaters to obtain permits or licenses. They may regulate the time, place, and manner for the conduct of adult businesses, including the hours of operation, noise, and parking. And while cities may revoke permits for noncompliance or prosecute for operating without one, they may not punish alleged violations directly as sex crimes without express legislative authority.
*249 Brix v. City of San Rafael (1979) 92 Cal.App.3d 47, 154 Cal.Rptr. 647 follows this formulation. The Brix court declined to enjoin the enforcement of a city ordinance regulating massage parlors. In addition to limiting the hours of operation, the ordinance required masseurs and masseuses to be clothed and prohibited them from touching their customers' genitals during a massage. Anaheim contends Brix is on "all fours" because "like the regulation in Brix, a violation of the [challenged [regulation is a misdemeanor." That is false. There was no preemption in Brix because, as the court specifically states, it was "not a criminal statute but rather a licensing statute, imposing certain standards of conduct as a condition for holding a massage license." (Id. at p. 53, 154 Cal.Rptr. 647, italics added.) Similarly, the ordinance at issue in Tily B. v. City of Newport Beach, supra, 69 Cal.App.4th 1, 81 Cal.Rptr.2d 6 was "directed at owners and managers of adult-oriented businesses, rather than performers" and provided that a "[violation is not criminal, but instead subject to being enjoined as a public nuisance, and the only sanction is revocation of a club's entertainment and adult-oriented business permits." (Id. at pp. 15-16, 81 Cal.Rptr.2d 6.)[4]
Anaheim responds that criminal prosecution was impliedly authorized under Government Code section 36900, subdivision (a), providing that violations of city ordinances may be either misdemeanors or infractions and are prosecutable by the city attorney.[5] But section 36900 has never been cited as authority for an express statutory waiver of state preemption in the field of sex crimes. To the contrary, Government Code section 36901 authorizes municipalities to impose penalties by fine or imprisonment for violations of ordinances, while Government Code section 37100 prohibits them from enacting ordinances that conflict with state law.
Anaheim purports to find express statutory authorization for regulating lap dancing with criminal sanctions in a zoning provision which authorizes local governments to regulate the "time, place, and manner of operation" of adult theaters through "content neutral zoning ordinance[s]." (Gov.Code, § 65850, subd. (g)(1).) Effective in 1995, this statute was amended to include theaters, concert halls, and similar establishments which previously had been exempted. (See Historical and Statutory Notes, 36D West's Ann. Gov.Code (1997 ed.) § 65850, p. 13.)[6]
*250 Anaheim claims section 65850 expressly allows it to enact a "criminally enforceable business regulation" against lap dancing so long as it is contained in a "comprehensive zoning [and] licensing ordinance" that is "applicable to regulatory violations by a regulated business's licensee and its agents." It explains the subject ordinance making erotic touching between dancers and patrons a misdemeanor qualifies because it is "part of a larger regulatory program" to eradicate the secondary effects of adult businesses in adjacent neighborhoods.
These arguments do not pass fundamental rules of statutory interpretation. In construing legislation our primary objective is to effectuate legislative intent. (People v. Yovanov (1999) 69 Cal. App.4th 392, 401, 81 Cal.Rptr.2d 586.) We look first to the plain language of the statute. (People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 301, 58 Cal.Rptr.2d 855, 926 P.2d 1042.) Where the words are clear, we do not alter or add to them to accomplish a hidden purpose, but we read them in harmony with the entire scheme of the law. (Herman v. Los Angeles County Metropolitan Transportation Authority (1999) 71 Cal.App.4th 819, 826, 84 Cal.Rptr.2d 144.)
Nothing on the face of section 65850 suggests a legislative purpose to allow localities to depart from the well-established rule that state law has preempted use of criminal sanctions to deal with unwelcome sexual activity. The statute on its face speaks of "content neutral zoning ordinances," not criminal statutes, and is contained in a "Zoning Regulations" chapter of a "Planning and Zoning" division in the "Planning and Land Use" title of the Government Code. Chapter and section headings are a consideration in determining legislative intent. (People v. Hull (1991) 1 Cal.4th 266, 272, 2 Cal. Rptr.2d 526, 820 P.2d 1036.)
Our view of section 65850 comports with an unbroken line of cases allowing localities to adopt adult-oriented regulations which affect sexual activity so long as they are noncriminal licensing statutes. As we stated in Tily B., "While the state has preempted the criminal aspects of sexual activity (Lancaster v. Municipal Court [, supra,] 6 Cal.3d 805, 808 [100 Cal.Rptr. 609, 494 P.2d 681]), localities remain free to regulate and license such conduct through noncriminal provisions. (Cohen v. Board of Supervisors, supra, 40 Cal.3d at p. 296 [219 Cal.Rptr. 467, 707 P.2d 840] [licensing of escort services]; EWAP, Inc. v. City of Los Angeles (1979) 97 Cal.App.3d 179, 191 [158 Cal.Rptr. 579] [licensing of peep shows]; cf. Eckl v. Davis (1975) 51 Cal.App.3d 831, 843 [124 Cal.Rptr. 685] [nudity prohibited in public parks and on public beaches].) ... [U] A [general] licensing statute aimed at activities expressly left open to local regulation does not conflict with the general law and is valid. (Brix v. City of San Rafael [, supra,] 92 Cal.App.3d 47, 53 [154 Cal.Rptr. 647].)" (Tily B., Inc. v. City of Newport Beach supra, 69 Cal.App.4th at p. 19, 81 Cal. Rptr.2d 6.)
Finally, we note Anaheim's proposal would make it extraordinarily difficult to determine whether a criminal sanction was a lawful means of enforcing a particular licensing rule. How would one know whether a specific criminal prohibition was an enforceable part of a comprehensive, regulatory sex-oriented zoning licensing ordinance? Under the Anaheim formulation, two adjoining cities could have identically worded local criminal ordinances *251 against lap dancing (or other forms of so-called sexual activity), but one city's would be a valid part of a "comprehensive zoning scheme," while the other's ordinance, if enacted as a "stand-alone criminal prohibition," would be preempted. Moreover, the Anaheim ordinance is not limited simply to owners and their agents. Any reasonable person would read the city's ordinance to prohibit customers from intimate contact with each other, as well. Even the city concedes preemption attaches to a "criminal sanction applicable to all persons who violate a legislative proscription." That is precisely what the Anaheim ordinance impermissibly does.[7]

III
We turn to the issues regarding the prostitution convictions. Here an elastic, but hoary, definition of "prostitution" accompanied the over-zealous enforcement of the overreaching zoning regulation we just examined.[8] Defendants do not attack the sufficiency of the evidence to support the convictions; and while we regard that matter as debatable, to say the least, we will confine our discussion to the main issue raised; the sufficiency of the jury instruction concerning prostitution, given the theatrical patina of the venue involved.[9]
*252 First Amendment concerns naturally arise when performers are criminally prosecuted because of their on-stage conduct with other performers. {Barrows v. Municipal Court (1970) 1 Cal.3d 821, 826, 83 Cal.Rptr. 819, 464 P.2d 483 ["theatrical performances ... are prima facie within the ambit of First Amendment protection"].) Erotic performances, even such relatively tame ones as Sally Rand's fan dancing, Gypsy Rose Lee's striptease, and Patrick Swayze's dirty dancing, are inevitably designed to sexually arouse or gratify. That, however, does not lessen their expressive function. As Judge Posner observed, "The goal of the striptease  a goal to which the dancing is indispensable  is to enforce the association: to make plain that the performer is not removing her clothes because she is about to take a bath or change into another set of clothes or undergo a medical examination; to insinuate that she is removing them because she is preparing for, thinking about, and desiring sex.... [¶][T]here would be no female stripteases without a prurient interest in the female body; but that is just to say that there would be no erotic art without Eros." (Miller v. Civil City of South Bend (7th Cir.1990) 904 F.2d 1081, 1091-1092 (conc. opn. of Posner, J.), revd. sub nom. Barnes v. Glen Theatre, Inc. (1991) 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504.) The upshot, of course, is that conduct many might find offensive enjoys First Amendment protection. The question we deal with here is how far that protection extends when a customer is brought into the act.
The prosecution served up the standard instruction on prostitution (CALJIC No. 16.420), and it was read by the judge in the same form in all the trials. As modified and given (with unimportant punctuation and spelling improvements), here it is: "Defendants are accused of having violated section 647, subdivision (b) of the Penal Code, a misdemeanor. [¶] Every person who, with the specific intent to engage in any act of prostitution, engages in an act of prostitution is guilty of a violation of Penal Code section 647, subdivision (b), a misdemeanor, [¶] `Prostitution' is engaging in any lewd act between persons for money or other consideration. [¶] `Lewd act,' as used in this instruction, means any act which involves the touching of the genitals, *253 buttocks, or female breast of one person by any part of the body of another person and is done with the intent to sexually arouse or gratify."
Recognizing the First Amendment implications we previously noted, the defense proposed a set of homemade, often argumentative, and generally ill-drafted instructions seeking to focus the jury's attention on this important aspect of the case. Unfortunately, although none of the 10 defense instructions (attached in an appendix) would have been proper for various reasons, the court did nothing at all to respond to the fact that the dance in a theatrical setting is entitled to the same protection as a D.H. Lawrence novel, a painting by Goya, a Fellini movie, or one of the Bard's plays. A ballet, cabaret, or dance hall interpretation of Lady Chatterly's Lover, with or without the novel's critical acclaim, would be as protected as the original written work.
Anaheim claimed there were no First Amendment implications because the courts have long recognized that engaging in sex acts with patrons is not protected First Amendment expression and the conduct proved here amounted to masturbation of the patrons by the lap dancers. The contention is that while erotic behavior by performers might be protected by the First Amendment in an otherwise artistic setting of some sort, e.g., a dance, not so when customers are introduced into the mix. Then we're talking prostitution, says Anaheim.
This alluring distinction does not hold up under analysis, however, although a superficial reading of occasional dicta can be read to support it. We need only recall the rich variety of American theater, past and present, involving audience members in stage, television, and circus performances: A prominent example is the "fall guy" asked to volunteer for the use, and sometimes abuse, of hypnotists, comedians, magicians, jugglers, singers, and so on  even dancers. Most often these "good sports" have paid to see the show. Thus, Anaheim's argument, while facile, does not work unless such performances do not enjoy First Amendment protection. Another court may hold that; we will not.
We must agree then with the defense on this point: The court did err in failing to bring the First Amendment problem to the jury's proper consideration. The defense evidence portrayed the charged conduct as exotic dances, not banal masturbation of the customers, and offered expert opinion to support that position. But although the theatrical aspect was central to the defense (and the ill-starred instructions proffered by defense counsel), the First Amendment claim was not the subject of appropriate instructions.
Sexual conduct in a theatrical context has produced these particularly pertinent cases: In People v. Malta (1984) 157 Cal. App.3d 309, 203 Cal.Rptr. 685, the Court of Appeal upheld pimping, pandering, and house of prostitution convictions arising from "shows" at the Lily Theater in Redwood City. There, patrons would pay at the door to watch, and after putting more money on the stage, be permitted to engage in a variety of sex acts (suckling breasts or oral copulation) with essentially naked female performers squatting or sitting on the edge of the stage. A few volunteers would be invited up on stage to be orally copulated themselves, each by one of the different female performers.
The court, speaking more broadly than necessary, perhaps, said this: "[W]e acknowledge that the state's unquestioned authority to prosecute under the pimping and pandering laws presents an incidental restriction on appellant's First Amendment freedoms. However, that restriction is no greater than is essential to further the substantial government interest in controlling prostitution. After all, the pimping and pandering laws do not prohibit the presentation of live, nude entertainment  they merely direct that the entertainer cannot have sexual relations with the audience." (Id. at p. 316, 203 Cal.Rptr. 685.)
*254 Several points ought to be remembered in considering Maita: It was a trial to the court on uncontested facts against the owner/manager of the theater only, in which, in addition to the convictions noted above, he was acquitted of three counts of presenting obscene live conduct. In contrast, the present appeal is from a jury trial where no finding of obscenity was sought or obtained and the facts were heavily in dispute (masturbation of patron or touching incidental to artistic performance?).
In People v. Freeman (1988) 46 Cal.3d 419, 250 Cal.Rptr. 598, 758 P.2d 1128, the Supreme Court considered the conviction of the producer and director of a commercial movie depicting, among other things, "various sexually explicit acts, including sexual intercourse, oral copulation and sodomy." (Id. at p. 422, 250 Cal.Rptr. 598, 758 P.2d 1128.) Although the court noted, "there was no determination the film was obscene" (id. at p. 423, 250 Cal.Rptr. 598, 758 P.2d 1128), it tended to treat the matter in the opinion as if the film had been found not to be obscene. The striking point is this: The court did not take it as a given that a film depicting actual intercourse, oral copulation, sodomy and the like was necessarily obscene.
Relying on Barrows v. Municipal Court, supra, 1 Cal.3d 821, 83 Cal.Rptr. 819, 464 P.2d 483, the court held Penal Code section 647, subdivision (a)'s prohibition on lewd conduct in public could not "apply to theatrical performances that came within the ambit of the First Amendment." (Freeman, supra, at p. 426, 250 Cal.Rptr. 598, 758 P.2d 1128.) Accordingly, the court unanimously held, "Since the acts involved here have not been adjudged obscene, they are within the protection of the First Amendment. To subject the producer and director of a nonobscene motion picture depicting sexual conduct to prosecution and punishment for pandering ... would rather obviously place a substantial burden on the exercise of protected First Amendment rights." (Id. at p. 426, 250 Cal.Rptr. 598, 758 P.2d 1128.)
For purposes of this case, the Freeman court's comments on Maita are of considerable import. It first noted the Maita opinion was "infirm" to the extent it relied on People v. Fixler (1976) 56 Cal.App.3d 321, 128 Cal.Rptr. 363, because Fixler "failed to give sufficient consideration to ... Barrows" and the sexual performer hired by the photographer in Fixler was a minor. (People v. Freeman, supra, at pp. 427-429, 250 Cal.Rptr. 598, 758 P.2d 1128.) The court then added, "Nevertheless, Maita is also fundamentally distinguishable from the instant case because it did involve prostitution, the payment by members of the `theater' audience for sexual conduct with the `actors' hired by the theater owner for that purpose. Thus although the theater owner was acquitted on charges of presentation of obscene live conduct ([Pen. Code,] § 311.6), convictions for procuring persons for purposes of prostitution could properly be affirmed. The Court of Appeal held that the pimping and pandering laws did not prohibit live nude entertainment, but `that the entertainer cannot have sexual relations with the audience.' [Citation.] Thus, the result in Maita was sound, but it has no application to this case." (Freeman, supra, at pp. 429-430, 250 Cal.Rptr. 598, 758 P.2d 1128, fn. omitted.)
One distinguishing feature of the present prosecution is that those cases involved undisputed sex acts between naked men and women, yet the Supreme Court in Freeman viewed each situation in light of the First Amendment. The trial court did no such thing here, rather it specifically refused to do so. That is the rub. The Freeman court's criticism of Maita for missing the lesson of Barrows turns out to be the very problem with the lower courts' handling of this case. Freeman is quite clear: Even conduct traditionally viewed as pandering, the procurement of persons for prostitution (sex for money), is fully protected by the First Amendment when *255 the filmed product of the event has not been adjudicated to be obscene.
In Maita the audience paid to participate in explicit sex acts without pretense of any theatrical context beyond the location, and the case was defended on a pure First Amendment basis on uncontested facts in a court trial. The First Amendment defense was an obvious sham, though, a transparent fig leaf for blatant criminal conduct.[10]
This case presents a very different picture. The performers' intent was a matter of serious contention; the alleged conduct itself was heavily disputed and far less explicit, even under the prosecution's most extreme description; and we deal with an instructional issue of fundamental importance. Should the jury have been given the option to find the conduct incidental to free expression? That is, should the case have been tried in light of First Amendment considerations? The answer, obviously, is yes. For the reasons we discussed earlier, hypnotists, comedians, and entertainers of various sorts do not lose their First Amendment protection simply by involving paying members of the audience in the performance.
For that reason we think the import of the holdings in Freeman and Barrows must prevail over the dicta of Maita (as repeated in dicta in Freeman). The trial court in this case properly rejected the objectionable defense instructions on the application of the First Amendment, but it should have given the CALJIC instruction on obscenity in theatrical performances in their place (CALJIC No. 16.211)[11] and told the jury obscenity was an additional element of the proof required beyond a reasonable doubt for purposes of the present case. Negation of First Amendment protection must be a part of any prosecution based on a performance presented and defended as theatrical in nature. Put another way, to remove the First Amendment shield in a case where the prosecution has elected to pursue a prostitution charge arising in a theatrical setting  at least in one that is not an obvious sham as in Maita  Freeman and Barrows mandate that it must prove the defendant's conduct was obscene in addition to the ordinary elements of the charge.
The Supreme Court approved an analysis similar to our own in Mitchell v. Superior Court (1989) 49 Cal.3d 1230, 1238-1239, 265 Cal.Rptr. 144, 783 P.2d 731: "The [trial] court ... expressly concluded that the onstage conduct was not a theatrical performance. It adopted the reasoning of People ex rel. Hicks v. Sarong Gals (1972) 27 Cal.App.3d 46 [103 Cal.Rptr. 414], that an exhibition calculated to arouse sexual desires and release inhibitions rather than to express emotion and dramatic feeling was simply commercialized lewdness. Therefore, the court held, *256 the conduct was lewd as that term is utilized in [Penal Code] section 647, subdivision (a), and was not `expression' protected by the First Amendment. (Cf. Barrows v. Municipal Court [, supra,] 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483].) The court also found, however, that the conduct was obscene and thus, even were it to be considered a theatrical performance, it was not protected. (Id. at pp. 830-831 [83 Cal.Rptr. 819, 464 P.2d 483].) Finally, the court determined that the lewd conduct was done for compensation inasmuch as the theater patrons paid admission and, notwithstanding `no-tipping' signs, overtly offered tips to the performers in return for sexual favors. Thus, the court concluded the lewd acts were also acts of prostitution proscribed by [Penal Code] section 647, subdivision (b)." (Italics added.)
The Supreme Court noted the Maita and Freeman decisions but, somewhat surprisingly, added, "[I]t is unnecessary to decide petitioners' further claim that the trial court erred in concluding the conduct here alternatively constituted acts of prostitution within the meaning of section 647, subdivision (b)." (Mitchell, supra, at p. 1255, fn. 18, 265 Cal.Rptr. 144, 783 P.2d 731.) This was the trial court's description of the alleged violations: "`The conduct complained of can be put into two categories: off-stage conduct, where performers permitted (if not encouraged) patrons to fondle genitals, breasts and buttocks, to engage in digital intercourse and oral copulation in return for tips; and secondly, on-stage conduct, where performers masturbated, inserted dildos in their vaginas, and engaged in oral copulation with other performers.'" (Id. at p. 1238, 265 Cal. Rptr. 144, 783 P.2d 731.)
As noted above, however, defendants do not attack the sufficiency of the evidence supporting the convictions in these prosecutions. But the cases teach that the court had an obligation to instruct on obscenity because it must be viewed as an element of any sex crime alleged to have occurred in a theatrical setting. It is hornbook law that the failure to instruct on an element of a crime is error. And it is rarely found to be harmless. We may "review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial" after proper objection "which affected the substantial rights of the defendant." (Pen.Code, § 1259.) Here, the defense more than preserved its position by objecting repeatedly and at length on First Amendment grounds to the instructions and tried, albeit ineffectually, to provide appropriate instructions of its own.[12] The conduct alleged was mild in comparison to the cases we have reviewed, and one of the three juries acquitted a theater manager and convicted none of the dancers of prostitution. We find the defendants' rights were substantially affected and a new trial on the prostitution charges is required.
The judgment is reversed with directions to dismiss the alleged city ordinance violations and to retry the prostitution charges at the election of the prosecution.
SILLS, P.J., and RYLAARSDAM, J., concur.

APPENDIX

Special Instruction No. 1
The conduct for which each of the Defendants is on trial allegedly took place at the premises known as the Sahara Theater. Each Defendant is charged with both violating a provision of the Anaheim Municipal Code as well as a state stature [sic] prohibiting prostitution.
With respect to the Anaheim Municipal Code provision, you are instructed that it is a complete defense to the charge of violating the Anaheim Municipal Code that the activity took place at a theater. If you *257 have a reasonable doubt as to whether the Sahara Theater is a theater, you must acquit.

Special Instruction No. 2
Notwithstanding the literal language of the Penal Code regarding prostitution, to convict a person of prostitution, the prosecution must prove beyond a reasonable doubt that the Defendant was offering to engage in sexual activity in exchange for money. Physical touching during a dance is not prostitution.

Special Instruction No. 3
It is an affirmative defense to the charges in this case that the Defendant was dancing in a theater. If you find by a preponderance of the evidence (if you have a reasonable doubt) that the Defendant was dancing in a theater, you must find her not guilty.
The performance by an entertainer of a dance is protected by the First and Fourteenth Amendments to the United States Constitution and Article I, Section 2 of the California Constitution unless the dance is illegally obscene. The dancers in this case have not been charged with presenting obscene live conduct. Whether or not they committed the crime of obscene live conduct is irrelevant to this case since no dancer has been charged with engaging in obscene live conduct. A defendant in a criminal case may not be convicted of one offense simply because she might be guilty of another offense. You are not to find a Defendant guilty of the crime or crimes charged simply because you believe that the conduct on trial must be a violation of some law.

Special Instruction No. 4
With respect to the prostitution counts only (Penal Code § 647b), the defense has produced evidence that the Sahara Theater is a theater and that the defendant dancers were dancing for a patron at the time of the alleged prostitution. If a substantial portion and purpose of the activity was the performance of the dance, the defendant dancers cannot be convicted of prostitution. For the defendant dancers to be guilty of prostitution, the prosecution must prove beyond a reasonable doubt that lewd conduct, and not the performance of the dance, was the primary purpose of the performance. If you have a reasonable doubt as to whether the primary purpose of the dance was to commit lewd conduct for money, you must acquit.
Essentially the jury must decide whether the dance was a dance or simply lewd conduct. If you have a reasonable doubt on this issue you must acquit.

Special Instruction No. 5
In this case the four female Defendant dancers are charged with violating the Anaheim Municipal Code, which prohibits certain forms of touching by entertainers of patrons. In addition, the City Attorney of Anaheim has also charged the four female Defendants with prostitution. The Defendant male manager is charged with aiding and abetting the Defendants to engage in an act or acts of prostitution.
Ordinarily prostitution is defined as any lewd act between persons for money or other consideration. However, if you determine that the four female Defendant dancers, or any one of them, were dancing at the time of the alleged offense or offenses, then you may not find the Defendants guilty of prostitution unless you find beyond a reasonable doubt that the touching by the dancer of the patron was not part of the dance.
There are other statutes that apply to live conduct which is alleged to be obscene. The Defendants, however, are not charged with obscene live conduct and therefore you may not convict them of prostitution because you believe what they did should be a violation of some law. It is incumbent upon the prosecution to charge the appropriate offense. If you believe that what the Defendants or any of them did was *258 improper you may not convict them simply because the prosecution did not charge the proper statute.

Special Instruction No. 6
A dancer who performs a dance may not be convicted of prostitution even if a portion of the dance includes the touching of the female breast and/or buttocks and/or genitalia with the body of a patron.
The Defendant dancers are charged with prostitution. While ordinarily the payment of money for a lewd act is prostitution, if the alleged lewd act occurs during the performance of a dance then the Defendant dancer may not be convicted of prostitution, unless you find that the touching was unrelated to the dance.
A defendant who engages in a dance is not immune from prosecution under the criminal law if a criminal act occurs during the performance of a dance that is not an integral part of the dance or is otherwise not entitled to an exemption. For example, if, during the performance of a dance, a dancer shoots and kills someone the dancer may not claim protection under the law or seek immunity from prosecution. The wrongful act may not be committed simply because it occurs during the performance of a dance. However, crimes involving touching (such as prostitution and lewd conduct) may not be applied to dancers who are legitimately dancing. If you have a reasonable doubt as to whether the dancer or dancers in question were dancing or not then you must find such dancer or dancers not guilty.

Special Instruction No. 7
A female dancer who, while performing a dance, causes her breast, buttocks, or genitals to come into contact with a patron, is not guilty of prostitution if such contact was part of the dance and if the dancer's specific intent was to perform a dance. Only if you find that the defendant was not dancing but rather was only touching the patron with her breast, buttocks, or genitals may you find the defendant dancer guilty of prostitution. The law against prostitution is primarily concerned with sexual acts such as sexual intercourse and oral copulation and is not concerned with contact by clothed dancers who, as part of the dance may touch the patron with her breast, buttocks, or genitals.
If a person purporting to be a dancer has sexual intercourse or oral copulation with someone alleged to be a member of the audience and contends that she was dancing, you may decide that the alleged dancing was simply a subterfuge or an excuse to engage in such sexual conduct and convict such a person of prostitution.

Special Instruction No. 8
Not every instruction given by the court may apply to the facts of this case as you have found them. An instruction may or may not apply given your determination of the facts.
You have been given the standard instruction regarding prostitution, which is the engaging in sexual intercourse or any lewd act between persons for money or other consideration. Such acts are prostitution if the defendant had the specific intent to engage in prostitution.
Some times [sic] the literal application of a criminal statute may not make sense or carry out the intent of the legislative body which enacted the statute. In this particular case, you may determine whether the prostitution statute should be applied to the conduct of the female defendants who are being prosecuted. In making this determination you may consider other laws that may apply to the acts in question and may also consider laws that apply to prostitution.
For example, the City of Anaheim prohibits entertainers from touching patrons in a certain way irrespective of the payment of money.

*259 Special Instruction No. 9
A defendant accused of prostitution may have a defense if the alleged lewd act is committed during the course of a dance. If you find by [sic] preponderance of the evidence that a lewd act was committed by the defendant during the performance of a dance and that the lewd act was incidental to the dance and not its main purpose, then you must acquit the defendant. This is an affirmative defense to the prostitution charge. You should only consider this affirmative defense if you first find beyond a reasonable doubt that the defendant committed prostitution. If you do not find beyond a reasonable doubt that the defendant committed prostitution, you should acquit the defendant without reaching the affirmative defense.
If, on the other hand, you do find beyond a reasonable doubt that the defendant did commit prostitution, then you should proceed to consider this affirmative defense for which the defendant has the burden of proof by a preponderance of the evidence, which simply means that it is more likely than not that the affirmative defense has been established.

Special Instruction No. 10
If you find all of the elements of the crime of prostitution as charged in the complaint to exist beyond a reasonable doubt, which would ordinarily be sufficient for a prostitution conviction, you must proceed to consider an affirmative defense. You must keep in mind that each defendant pleaded not guilty and that unless guilt is established beyond a reasonable doubt you must acquit. If you have not been convinced beyond a reasonable doubt of the defendant's guilt you must acquit and should not consider an affirmative defense.
It is an affirmative defense to a prostitution charge that the lewd act was incidental to a dance and that the primary purpose of the dance was not to commit lewd acts. The defendant has the burden of proof by a preponderance of the evidence that the acts, if lewd occurred during the performance of a dance and that the primary purpose of the dance was not to commit lewd acts. If you find the affirmative defense to exist, you must acquit, notwithstanding that you previously found the defendant to have committed prostitution.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] See Gammoh v. City of Anaheim (1999) 73 Cal.App.4th 186, 86 Cal.Rptr.2d 194, mod. 73 Cal.App.4th 1264a.
[2] Chapter 18.89 of the Anaheim Municipal Code contains detailed regulations regarding the time, place and manner of sexually oriented businesses based on findings regarding their adverse secondary effects on crime, depreciation of property values, litter, noise, vandalism, and degradation of adjacent neighborhoods. The code requires the licensing of adult businesses, and establishes a variety of proximity restrictions and structural requirements, including the posting of security guards, landscaping, lighting, signage and screening.

The no-touching rule bars intimate physical contact between entertainers and patrons. It provides, "No entertainer shall have physical contact with any patron, and no patron shall have physical contact with any entertainer while on the premises, which physical contact involves the touching of the clothed or unclothed genitals, pubic area, buttocks, cleft of the buttocks, perineum, anal region, or female breast with any part or area of such other person's body." (Anaheim Mun.Code, § 18.89.030.0520.05.)
A later provision makes violations of Chapter 18.89 a misdemeanor. Section 18.89.100 states, "Failure to comply with any requirement of this chapter shall constitute a violation of this chapter. In addition to any other remedies provided by law or set forth in this chapter, any violation of the provisions of this chapter shall be a misdemeanor punishable as set forth in Section 1.01.370 of this Code."
[3] For example, the evidence regarding Karen Janini's act of "prostitution" showed that her breasts (covered with a bikini top) "touched" a spectator's body, who paid her. As to defendant Gloria Hernandez, a patron testified that he paid her $70 for seven lap dances, plus a $10 tip, and was sexually aroused when she rubbed her breasts, buttocks and vaginal area against his body.
[4] For unexplained reasons Anaheim did not attempt to revoke the Sahara Theater's license or prosecute the owner along with the employees, moves one would expect if regulation of the business was the primary purpose.
[5] The statute provides, "Violation of a city ordinance is a misdemeanor unless by ordinance it is made an infraction. Such a violation may be prosecuted by city authorities in the name of the people of the State of California, or redressed by civil action." (Gov.Code, § 36900, subd. (a).)
[6] The amendment became effective in the summer of 1995 as urgency legislation. With the 1995 amendment, Government Code section 65850 reads as follows: "The legislative body of any county or city may, pursuant to this chapter, adopt ordinances that do any of the following: [¶] (a) Regulate the use of buildings, structures, and land as between industry, business, residences, open space.... [¶ (b) Regulate signs and billboards, [¶] (c) Regulate ... [t]he location, height, bulk, number of stories, and size of buildings and structures .... [¶] (d) Establish requirements for offstreet parking and loading. [¶] (e) Establish and maintain building setback lines, [¶] (f) Create civic districts around civic centers, public parks, public buildings, or public grounds, and establish regulations for those civic districts. [11] (g)(1) Regulate, pursuant to a content neutral zoning ordinance, the time, place, and manner of operation of sexually oriented businesses, when the ordinance is designed to serve a substantial governmental interest, does not unreasonably limit alternative avenues of communication, and is based on narrow, objective, and definite standards. The legislative body is entitled to rely on the experiences of other counties and cities and on the findings of court cases in establishing the reasonableness of the ordinance and its relevance to the specific problems it addresses, including the harmful secondary effects the business may have on the community and its proximity to churches, schools, residences, establishments dispensing alcohol, and other sexually oriented businesses. [¶] (2) For purposes of this section, a sexually oriented business is one whose primary purpose is the sale or display of matter that, because of its sexually explicit nature, may, pursuant to state law or local regulatory authority, be offered only to persons over the age of 18.[¶] (3) This subdivision shall not be construed to preempt the legislative body of any city or county from regulating a sexually oriented business, or similar establishment in the manner, and to the extent permitted by the United States Constitution and the California Constitution."
[7] At oral argument Anaheim likened its ordinance to Business and Professions Code sections 25631 and 25632 which allow for misdemeanor prosecutions of "[a]ny on- or off-sale licensee, or agent or employee of such licensee" who sells alcoholic beverages after 2 a.m. The situations are not similar. Anaheim's no-touching rule broadly speaks about entertainers and patrons and does not limit criminal prosecution to licensees and their employees. Moreover, alcohol sales do not involve any issues of state preemption since the Legislature has expressly criminalized the conduct in question and included licensees and employees within the statute's ambit, thereby eliminating any concerns about notice or uniform state application.
[8] Penal Code section 647, subdivision (b) provides, "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: ... [¶] (b) who ... engages in any act of prostitution.... As used in this subdivision, `prostitution' includes any lewd act between persons for money or other consideration."
[9] Used in a nontraditional setting, such as here, the prostitution statute is devilishly vague; for reasonable persons can honestly differ over the scope of its application. Most people understand that prostitution involves sexual intercourse for money and would probably conclude that it encompasses oral and anal copulation, digital penetration and manual masturbation as well. (See People v. Dell (1991) 232 Cal.App.3d 248, 263-264, 283 Cal. Rptr. 361; see general discussion in 63C Am. Jur.2d Prostitution, § 7, pp. 175-176, 2 Witkin & Epstein, Cal.Criminal Law (2nd ed. 1988) Crimes Against Decency and Morals, § 807, p. 918.)

But California's prostitution statute much more broadly defines prostitution as "any lewd act between persons for money or other consideration." (Pen.Code, § 647, subd. (b), italics added.) To pass constitutional muster, it has been judicially interpreted to require physical contact with the genitalia or buttocks of either the prostitute or the customer for the purposes of sexual arousal or gratification. (People v. Hill (1980) 103 Cal.App.3d 525, 534-535, 163 Cal.Rptr. 99.)
As illustrated by this case, other uncertainties remain. Does the prostitution statute extend to any erotic touching between clothed individuals, even when there is no form of sexual intercourse in any guise? The trial court recognized its expansive interpretation of prostitution could cover a host of innocent activities: "MR. DIAMOND: Dime a dance, taxi dancing. It's a well-established tradition in America. [¶] You could argue, I suppose, that that's prostitution if you pay a dancer to dance with you, unless you are dancing  [¶] THE COURT: If she is wearing a thong bikini, that argument could certainly be made." (Italics added.) To the court's example, we would add another American institution: the bachelor or bachelorette party, where erotic activities (that most people would not construe as prostitution) sometimes take place with hired performers.
Since we resolve this case on obscenity grounds, we need not decide whether the otherwise vague statutory term "lewd acts" must be subjected to further judicial construction in the context of clothed individuals. Had the parties not tied this appeal up to a First Amendment mooring, we might have set sail with a well-reasoned opinion from the "Show Me state" on facts like our own. In State v. Burgess (Mo.App.1984) 669 S.W.2d 637, the court reversed the prostitution conviction of a lap dancer who stood on a chair in front of a patron and performed a "series of hip gyrations and squatting movements" that the court likened to the "not-so-modern erotic dance routine commonly labeled `bumps and grinds.'" (Id. at p. 638.) Since she was a "dancer[], not [a] magician! ]," the patron periodically touched her buttocks and thighs to steady her while she rubbed her genitals (covered by a scanty bikini bottom) over his nose and face. (Ibid.) The pertinent Missouri statutes defined "prostitution" as "any touching, manual or otherwise, of the anus or genitals of one person by another, done for the purpose of arousing or gratifying sexual desire of either party" in which a payment was involved. (Id. at p. 639.)
Burgess readily conceded the performance was in bad taste, but "there is no law against bad taste," which should "be reassuring to much of the modern entertainment industry." (Ibid.) Considering the due process implications of lack of notice, the Missouri court declined to judicially interpret its prostitution laws to include acts not clearly described by them. The court pointed out that the pertinent language (like California's) prohibited the commercial touching of the "`anus or genitals' of a person. That language does not on its face include the clothing covering the genitals or anus. We cannot conclude that the language is equally prohibitive of touching whether the touchee is nude or wearing a mackinaw, or that it would apply to a fully clothed couple dancing pelvis to pelvis where one of them is being paid for the dance. At the most, the language is ambiguous as to whether such conduct is condemned." (Ibid.)
Burgess presumed the Legislature would know how to draft a sex crimes law that precluded clothed "sexual contact." For example, other sexual assault laws specifically barred sexual touching of genital or anal areas including "`touching through the clothing.'" (Id. at p. 640.) The court refused to infer such differences inadvertently, particularly in light of "one of the prime purposes of prohibition of prostitution  spread of venereal infection. [Citation.] It is evident that where the [Legislature] desired to provide that a touching through clothing was prohibited, it expressly so stated.... We are unable to find therefore that [the prostitution statute] is violated by a touching of clothing covering the genitals." (Ibid.)
[10] Although the judge surprisingly acquitted on the obscenity counts in Maita, it would be a mistake to place much weight on that for several reasons. That may not have been inconsistent with the verdicts at all. We simply do not know, for example, if the acquittals were based on other factors (those counts could have related to other conduct not described in the opinion; might have been considered "lesser-includeds," formally or informally; might have been the equivalent of a "jury pardon" by the judge; or simply might have been a recognition that obscenity charges relating to an open house of prostitution were beside the point.)
[11] We are aware that the instruction was designed for Penal Code section 311.6 applications, but the city elected to charge prostitution instead of applying section 311.6, the more apt section, it seems to us, anyway. Paraphrased, CALJIC No. 16.211 states that to find live conduct obscene the jury must find these elements proved: physical, human body activity by an individual alone or with other persons that includes, but is not limited to, singing, dancing, acting, simulating, or pantomiming, which to the average adult using the contemporary standards of this state, appeals to prurient interest or involves shameful or morbid interest in nudity, sex, or excretion, and is conduct that, taken as a whole, lacks serious literary, artistic, political, or scientific value.
[12] The defense "Special Instruction No. 4" would have been better than the option selected by the court: nothing. But we think CALJIC No. 16.211 is far superior.